**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT COURT OF NEW MEXICO**

| | |
|---|---|
| GUADALUPE CHAVEZ, LORENZA ROMERO, ALICE SANCHEZ, SUSIE TRUJILLO, and PETRA VELARDE, Plaintiffs on behalf of themselves and all others similarly situated, <br><br> vs. <br><br> THOMAS VILSACK, Secretary of the Department of Agriculture, <br><br> VILLAS DE AVENIDA CANADA, LLC., and BOSLEY MANAGEMENT, INC., Defendants | CASE NO: |

**CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT,
INJUNCTIVE RELIEF, AND DAMAGES**

### I.     PRELIMINARY STATEMENT

1.      This lawsuit is brought on behalf of a proposed class of low-income individuals who are current or former tenants at La Vista Del Rio Apartments, a 49-unit rental housing complex in Española, New Mexico, which until September 15, 2023, was deeply subsidized affordable housing under the United States Department of Agriculture (USDA)'s Rural Development (RD) Section 515 loan program and Section 521 Rental Assistance deep subsidy program.

2.      Contrary to the Emergency Low-Income Housing Preservation Act (ELIHPA), regulations and its own Handbook, RD unlawfully approved the prepayment of the loan 12 years before its natural maturity, which terminated all RD subsidies to the property and directly

harmed the Plaintiffs, resulting in the loss of vital tenant protections and the looming threat of evictions to current tenants as well as the unlawful displacement and homelessness of others.

3.      In addition, RD avoided its obligation to consider the impact of loan acceleration and prepayment on the residents of La Vista Del Rio when it failed to offer them the opportunity to appeal RD's decisions to accelerate and approve prepayment of the loan in violation of the Plaintiffs' due process rights guaranteed by 7 U.S.C. § 6991 et seq., 42 U.S.C. § 1480(g), and the 5th Amendment Due Process Clause.

4.      The current owner has engaged in actions that harm the remaining residents, which include threatening rent increases and demanding that they obtain an RD Voucher and sign new leases, which violate the use restriction, the existing residential leases and New Mexico state law.

5.      The former and current owners failed to make timely repairs and maintain Plaintiffs' housing in a safe, decent, and sanitary condition in violation of their obligations under the Section 515 and 521 programs and the New Mexico Uniform Owner-Resident Relations Act.

6.      Finally, RD continues to operate its voucher program in violation of federal law and in an arbitrary and capricious manner in violation of the Administrative Procedure Act. For example, following La Vista Del Rio's sale to the current owner and exit from the Section 515 portfolio, RD approved residents to remain at the property using RD vouchers. The owner has not made repairs to the units where vouchers are being used even though RD had previously claimed the prior owner could not make the place safe to live when it decided to accelerate the loan.

7.      Plaintiffs bring this lawsuit for injunctive, declaratory, and monetary relief to

ensure that Defendants extend to Plaintiffs all the protections contained in the use restriction, their leases, and federal and state laws. Plaintiffs also seek to halt the current owner's threat of rent increases and the owners' demand that Plaintiffs enter into new leases and the RD Voucher program, all of which are less advantageous to Plaintiffs than the existing use restriction and could result in the loss of vital tenant protections, their evictions and homelessness.

## II.    JURISDICTION AND VENUE

8.    The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337, 1343(a)(3) and (4), 1361, and 1367, in that the Plaintiffs' claims arise under the Fifth Amendment to the U.S. Constitution and the Administrative Procedure Act. The Court has supplemental jurisdiction over the state law claims because they arise out of the same set of facts as Plaintiffs' federal law claims. Declaratory relief is authorized by 28 U.S.C. §§ 2201-2202.

9.    Venue is proper pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims in this action occurred in this judicial district, and the property that is the subject of the action is situated in this judicial district.

## III.    PARTIES

10.    Plaintiff Guadalupe Chavez is a very low-income resident of La Vista Del Rio who has lived at the property since 2000. He received Rental Assistance, an RD rental subsidy that limited his individual rent contribution to 30% of his adjusted monthly income. His current rent is $319 per month. He is on a 12-month lease which will end August 1, 2025, and automatically renews annually. The current owner told him he needed to apply for an RD Voucher. Mr. Chavez is Latino.

11.     Plaintiff Lorenza Romero is a very low-income resident of La Vista Del Rio who has lived at the property since December 2022. She lives in a 2-bedroom apartment with two of her children. She received Rental Assistance, and her rent was $146 per month. She had a 12-month lease that automatically renews annually. The current property manager told her that her rent would increase to over $1,000 if she stayed. Because the property manager told her that the rent would increase if she did not have an RD Voucher, she applied for an RD voucher, which required her to sign a new lease that denies her benefits that she has received under the 515 program and does not protect her against eviction at the end of the lease term. Since signing the voucher, her rent has increased over $214 to $360 per month – a nearly 70% increase. Her lease ends in February 2025. Ms. Romero receives Social Security Disability Income. She is Latina.

12.     Plaintiff Alice Sanchez is a former, very low-income resident of La Vista Del Rio who lived at the property from 2021-2023. She left in March 2023 when management informed her the building would be shut down. Prior to her forced departure, she received Rental Assistance, paid $120 per month for rent, and had a 12-month lease that automatically renewed annually. When she was displaced, she was immediately unable to find a rental unit she could afford and was forced to live in her car. She had to leave Española and now pays $1,000 per month for rent. Her son has to help her with rent payments because the rent is more than she receives from Social Security Disability Income. She has not been able to find anywhere she can afford on her own in New Mexico. She applied for an RD Voucher but has not received any further assistance. She is Black and Latina.

13.     Plaintiff Susie Trujillo is a former, very low-income resident of La Vista Del Rio who lived at the property from 2018-2023. She received Rental Assistance, paid $10 per month

for rent, and had a 12-month lease that automatically renewed annually. She had no income other than SNAP. She had to leave the property and her affordable home in March 2023 after management informed her the building would be shut down. She is now working full-time as a custodian and earns less than $3,000 per month. She now pays $1,000 per month for rent. She is Latina.

14.     Plaintiff Petra Velarde is a very low-income resident of La Vista Del Rio who has lived at the property since 2009. She is the primary caregiver for her two minor children. She received Rental Assistance and pays $28 per month for rent. She has a 12-month lease which automatically renews annually. The current property manager told her that if she stayed at the property her rent would increase to $1,000 per month at the end of her lease. She works full-time. She has tried to find other housing that she can afford but cannot find anything in Española that she can afford on her salary.

15.     Defendant Thomas Vilsack, the Secretary of the United States Department of Agriculture ("USDA" or "The Agency"), is statutorily vested with the authority to operate the rural housing programs authorized by Title V of the Housing Act of 1949, 42 U.S.C. 1471 et seq. Defendant Vilsack ("Federal Defendant") is sued in his official capacity.

16.     Defendant Villas de Avenida Canada, LLC, a New Mexico LLC, acquired La Vista Del Rio on or about September 25, 2023, and is the current owner of La Vista Del Rio.

17.     Defendant Bosley Management, Inc., an active Wyoming corporation currently registered to do business in New Mexico, operated La Vista Del Rio under the Section 515 program and was an agent of the former owner, La Vista Del Rio Apartments LP.[1]

---

[1] Collectively, unless otherwise noted, defendants Villas de Avenida Canada, LLC and Bosley Management, Inc.,

## IV.   STATUTORY AND REGULATORY FRAMEWORK

### A. USDA's Section 515 Program

18.     The Section 515 rural rental housing loan program, initially authorized by the Senior Citizens Housing Act of 1962, is a cornerstone of federally assisted affordable housing in rural areas of the United States.

19.     The USDA, through its RD mission area and the Rural Housing Service (RHS), finances and subsidizes the development and operation of rental housing in rural areas throughout the United States under Section 515 of the Housing Act of 1949. 42 U.S.C. § 1485.

20.     The Section 515 program authorizes RD to make loans to private, public, and nonprofit developers to construct and operate subsidized housing for very low-, low-, and moderate-income families, elderly persons, and persons with disabilities. 42 U.S.C. § 1485. These 30-year loans are provided at an effective 1% interest rate and are amortized over 50 years. *Id*.

21.     Housing developments financed through the Section 515 program are subject to certain affordability requirements and rent restrictions that remain in effect throughout the term of the loan.

22.     Residents of Section 515 developments may be beneficiaries of Interest Credit and Rental Assistance subsidies from RD. These subsidies, both authorized by 42 U.S.C. § 1490a, enable low- and very low-income people to afford the rents in Section 515 developments.

23.     The Interest Credit subsidy program, which reduces the interest rate on a Section 515 loan to a 1% effective interest rate, is available for all Section 515 developments and units.

---

will hereafter be referred to as the "Private Defendants."

42 U.S.C. § 1490a(a)(1)(B).

24.     Under the Interest Credit program, the owner, with RD's approval, establishes a basic rent for each unit in the development, which is based on the cost of operating the development and amortizing the RD loan at the 1% interest rate. Residents pay the higher of 30% of their income or the basic rent, which is usually less than market rent in the area. 7 C.F.R. §§ 3560.11 and 3560.203(a).

25.     Rental Assistance (RA) is a deep subsidy program authorized by 42 U.S.C. § 1490a(2)(A) which is available to very low- and low-income residents of Section 515 housing. Beneficiaries of the program pay 30% of household income for shelter, which includes the cost of rent and utilities.

26.     RA is extended to residents through a contract between the owner and RD for a certain number of housing units in a development. These contracts may provide RA to some or all of the resident households in a development.

27.     Residents' shelter costs in Section 515 developments include the cost of rent and tenant-paid utilities.

28.     Where the resident is responsible for paying the cost of utilities, they receive a utility allowance from the owner. This utility allowance offsets the cost, keeping the resident's shelter costs at 30% of adjusted income.

29.     The administration of the Section 515 program is governed by statutes, regulations and handbooks.

### B. USDA Loan Prepayment Requirements Under ELIHPA

30.      In 1988, in response to increased prepayments of Section 515 loans and the

negative impact those prepayments had on residents and the loss of affordable housing in rural communities, Congress enacted the Emergency Low-Income Housing Preservation Act (ELIHPA), P.L. 100-242 (Feb. 5, 1988).

31.     ELIHPA's provisions applicable to Section 515 developments were intended to preserve Section 515 projects as affordable housing and protect residents against displacement by restricting the loan prepayment rights of owners who had entered Section 515 loans before December 21, 1979.

32.     The express purposes of ELIHPA included the preservation and retention "to the maximum extent practicable as housing affordable to low-income families or persons those privately-owned dwelling units that were produced for such purpose with Federal assistance; [and] to minimize the involuntary displacement of tenants currently residing in such housing." *Id.* at 101 Stat. 1878.

33.     In 1989, Congress adopted prepayment restrictions on all new Section 515 loans made after December 15, 1989, for the term of the loan, 42 U.S.C. § 1472(c)(1)(B), thereby eliminating future prepayments of development financed after 1989.

34.     In 1992, Congress extended the ELIHPA prepayment restrictions to all developments financed between December 21, 1979 and December 15, 1989. 42 U.S.C. § 1472(c)(1)(A).

35.     There is no statutory exception to ELIHPA's prepayment restrictions.

36.     RD regulations define a prepayment as "[p]ayment in full of the outstanding balance on an Agency loan prior to the note's originally scheduled maturity date." 7 C.F.R. § 3560.11.

37.     Once a loan is prepaid all subsidies that reduce the rents to residents, including Interest Credit and Rental Assistance, cease. 42 U.S.C. §§ 1490a(a)(1)(B) and 1490a(2)(A); 7 C.F.R. § 3560.11.

38.     Once a complete prepayment request has been submitted by an owner of a Section 515 property, RD has 30 days to notify residents of the owner's request to prepay the loan, pursuant to 7 C.F.R. § 3560.654, and 60 days to determine the eligibility of the loan for prepayment and whether the borrower has or will comply with applicable prepayment laws and regulations. If the owner's prepayment request meets these and other requirements, RD must offer incentives to the owner to remain in the program. 42 U.S.C. § 1472(c)(3); 7 C.F.R. § 3560.653(e).

39.     If the owner rejects the incentives, RD must determine whether the prepayment will materially affect housing opportunities of minorities. 42 U.S.C. § 1472(c)(5)(G)(ii). When RD determines that prepayment will materially affect housing opportunities of minorities, the owner must, for 180 days, offer to sell the development at its market value to a nonprofit or public agency which would maintain the development as affordable housing. 42 U.S.C. §§ 1472(c)(5)(A), 1472(c)(5)(G).

40.     Prior to 2005, RD regulations with respect to making a finding on the impact of the prepayment on minority housing opportunities mirrored the statute by requiring RD staff to make a negative determination that minorities will not be materially affected as a result of the prepayment. 7 C.F.R. § 1965.215(c)(1)(i) (1993).

41.     In 2005, RD modified this to require a finding of whether minorities in the project, on the waiting list or in the community will be *disproportionately adversely* affected by

the loss of the affordable rental housing. 7 C.F.R. § 3560.658(b). RD explained this change by stating that comments were received asking for additional information on how the determination of minority impact is reached. In response, RD agreed "that 'adverse impact' needed further clarification and has clarified that the adverse impact should be disproportionate. Additional details on how the Agency will review relevant information is available in Agency guidance about program procedures." 69 Fed. Reg. 69032 and 69094 (Nov. 24, 2004).

42.     The only guidance that RD has published with respect to making the impact of a prepayment on minority housing opportunities is set out in RD Handbook 3-3560. It requires the RD Civil Rights staff to assess the impact of a prepayment on minority housing opportunities and defines relevant factors to be considered as:

▪       The percentage of minorities residing in the project and the percentage of minorities residing in the projects in the market area where displaced tenants are most likely to move;

▪       The impact of prepayment on minority residents in the project and in the market area. Determine whether displaced minority tenants will be forced to move to other low-income housing in areas not convenient to their places of employment, to areas with a concentrated minority population and/or to areas with a concentration of substandard housing;

▪       The vacancy trends and number of potential minority tenants on the waiting list at the project being prepaid and at other projects in the market that might attract minority tenants; and

▪       The impact prepayment will have on the opportunity for minorities residing in

substandard housing in the market area to have comparable decent, safe and affordable housing, as is offered by the project being prepaid. RD Handbook 3-3560, ¶ 15.21 (02-24-05) Rev. (11-07-08).

43.     These factors only look at the impact of a prepayment on minority housing opportunities without comparing it to the impact on non-minorities.

44.     If the prepayment has no adverse effect on minority housing opportunities, RD must next determine if there is adequate comparable affordable housing in the community to which the current residents of the development can relocate. If such housing is available, the owner is free to prepay the loan without restrictions. If, however, RD determines that there is not adequate comparable affordable housing, the owner can only prepay the loan subject to use restrictions, which (in cases where all the residents have Rental Assistance) protect the current residents from rent increases not based upon an increase in a resident's income, as long as they choose to live in the development. 7 C.F.R. §§ 3560.662(a) and (e), 3560.203(a). These restrictions are binding on the prepaying owner as well as any successors in interest and are enforceable by RD and the remaining residents. *Id.* § 3560.662(d).

45.     When a borrower of a Section 515 development prepays a loan, RD subsidies terminate as does RD's regular supervision and monitoring of most of the borrower's actions including approval of all rent increases, the maintenance of the development, the content of leases, the term of leases, and the basis upon which a lease may be terminated.

### C. RD's Liquidation Process for Noncompliant Borrowers

46.     Section 515 borrowers have an obligation to maintain their properties in a decent, safe, and sanitary manner.

47.     Where a borrower fails to maintain its property in a decent, safe, and sanitary manner, RD issues a compliance violation notice to the borrower to correct the identified violation(s) within a specified period of time. 7 C.F.R. § 3560.354. Where a borrower fails to maintain its property in a decent, safe, and sanitary manner, RD issues a compliance violation notice to the borrower to correct the identified violation(s) within a specified period of time. 7 C.F.R. § 3560.354.

48.     If the borrower fails to correct the identified violation(s) within the time specified in the notice, they will be considered in default. 7 C.F.R. § 3560.452(c) and (e).

49.     When a borrower is in default, the Agency issues the borrower a default notice detailing the compliance violation that led to the default, specifying the actions necessary to cure the default, and establishing a deadline by which the default must be cured to avoid Agency initiation of enforcement actions, liquidation, or other actions. 7 C.F.R. § 3560.452(d).

50.     A borrower may work to resolve a compliance violation or default (and avoid liquidation or enforcement action by RD) by entering into a workout plan with the Agency. 7 C.F.R. § 3560.453.

51.     RD will only approve a workout plan if the Agency determines that (1) the actions proposed are likely to correct the compliance violations, (2) approval is in the best interest of the Federal Government and tenants, and (3) the proposed actions are consistent with the borrower's management plan. 7 C.F.R. § 3560.453(b).

52.     The onus to develop a workout plan is on the borrower, and the Agency is under no obligation to approve a workout plan submitted by the borrower. 7 C.F.R. § 3560.453(b).

53.     If the borrower fails to cure the default, the Agency will accelerate the loan,

which it refers to as liquidation, unless it determines other enforcement measures are appropriate. 7 C.F.R. § 3560.456(b); 7 C.F.R. § 3560.452(e).

54.     Pursuant to RD's regulations, before accelerating a loan, the Agency must consider whether the borrower is forcing an acceleration to avoid the prepayment process prescribed by ELIHPA. 7 C.F.R. § 3560.456(a). If the Agency finds the borrower is seeking to avoid the prepayment process, RD will consider alternatives other than acceleration, such as suing for specific performance under the loan and management documents. *Id.*

55.     As part of accelerating the loan, RD requires the borrower to take the following actions to protect the tenants: (1) extend all tenant leases for 180 days after the date the accelerated loan was paid off and (2) execute restrictive-use provisions. Exh. 1, Tenant Protection Actions; *see also* HB-3-3560, p. 12-12. In addition, RD requires the borrower to provide it with a list of current tenants so that the local Servicing Office can notify tenants that the project is being prepaid and provide eligible tenants with Letters of Priority Entitlement (LOPE). Exh. 1. A LOPE allows residents to go to the top of all waiting lists of any RD property, anywhere in the country, if the resident is eligible to live there. 7 C.F.R. § 3560.11.

56.     After acceleration of the loan, the "borrower's account may be paid off by cash, transfer and assumption, sale of the property, or voluntary conveyance." HB-3-3560, 12-13. The borrower may also voluntarily liquidate through a deed in lieu of foreclosure. 7 C.F.R. § 3560.456(c).

57.     Tenants must be informed about the consequences of loan acceleration and, if the property will no longer participate in the Section 515 or 521 programs, tenants must be given a minimum of 180 days written notice. HB-3-3560, 12-11.

58.     If the borrower fails to comply with the requirements contained in the acceleration notice, the Agency will foreclose or acquire the security property through deed in lieu of foreclosure. *Id.*

59.     Upon acceleration of the loan, the Agency will cancel the interest credit and suspend rental assistance to the property. *Id.*

### D. Rural Development Voucher Program

60.     RD operates a rural housing voucher program ("RD Voucher Program"). 42 U.S.C. § 1490r. When Congress funded the program for the first time in fiscal year 2006, P.L. No. 109-97 (Nov. 10, 2005), 119 Stat. 2120, 2139, it limited the use of RD Vouchers to only assist households facing hardship or displacement from the prepayment of RD Section 515 loans. Eligibility for the RD Voucher Program was expanded to also include residents of Section 515 properties that were subject to foreclosure and mortgage maturity.

61.     The subsidy amount provided to residents under the RD Voucher Program is permanently limited to the difference between the market rent of the prepaid unit and the amount that eligible households paid for shelter as of the date of prepayment. Residents who received a utility allowance, such as the Plaintiffs, prior to the prepayment do not receive an ongoing utility allowance under the RD Voucher program. The end result of entry into the RD Voucher Program is that residents begin to pay more than 30% of their adjusted income towards shelter costs.

62.     The RD Voucher Program provides no additional financial assistance to residents who have Rental Assistance and live in properties prepaid subject to use restrictions. For residents who received Rental Assistance prior to the prepayment, their shelter payments under the use restrictions, which include rent and a utility allowance, always remain the same as their

shelter payments were before the prepayment.

63.     Importantly, Senate and House Conference Committee reports make clear that the vouchers do not "alter prepayment restrictions…" Senate Rep. 109-92, Pgs. 115-116 (June 25, 2005); House Conf. Rep. 109-255, Pg. 92 (Oct. 26, 2005). Congress has continued to fund the RD Voucher Program every year since 2006 maintaining the same general restrictions. *See e.g.* P.L. 116-260, Stat (Dec. 27, 2020).

64.     The RD Voucher Program Guide also underscores that owners who prepay must honor the leases of tenants residing at the property as of the prepayment, including for tenants to continue to pay their previously subsidized rent without the benefit of Rental Assistance. Rural Development Voucher Program Guide, § 2.5 (Sept. 2010) ("Voucher Guide"). The Voucher Guide also notes that because the RD Voucher requires a new lease, it is not possible to provide an RD Voucher during the remaining term of the lease after prepayment. *Id*. Finally, the Guide makes clear that tenants in the rent-restricted units "may choose to continue with rent restrictions instead of using a voucher…" *Id*. § 1.1.

65.     When an RD Voucher is going to be issued due to a prepayment, RD issues a letter early in the prepayment process. The letter is issued to all tenants and advises them of their rights in the event of prepayment. MFH RD Voucher Program Guidebook, at 60.

66.     Once the prepayment or foreclosure occurs, RD issues another letter notifying current tenants that they are eligible to apply for an RD Voucher.

67.     To apply for the RD Voucher, tenants must sign the Voucher Obligation Form and complete the Citizenship or Eligible Immigration Status Declaration document and submit them to USDA.

68.     Upon receipt of both documents, USDA conducts the initial eligibility determination. If the tenant is determined eligible to receive a voucher, RD advises them of their eligibility status, the amount of the voucher they are eligible for, and who to contact to receive their voucher.

69.     The tenant is then responsible for finding a suitable unit. The tenant and the unit owner must complete and return the Request for Tenancy Approval. Then, RD conducts an inspection of the unit. However, for former RD properties, in lieu of an inspection, RD may submit a State Director's Letter certifying that the property has been inspected in the last year.

70.     If the unit does not pass inspection, RD notifies the owner and the tenant. If the owner is willing to correct the issues identified, RD schedules another inspection. If the second inspection fails, RD requires the tenant to find another unit that will pass inspection.

71.     If the unit passes inspection, RD notifies the owner and the tenant. RD also notifies the contractor charged with administering the RD Voucher program.

72.     The contractor then sends the owner a Housing Assistance Payments ("HAP") contract and HUD lease addendum, both of which the owner is required to sign and return to the contractor.

73.     The owner and the tenant are then required to sign a new lease that contains the signed HUD lease addendum.

74.     RD has never developed a HAP contract or tenancy addendum for use in developments that are prepaid subject to use restrictions where RD Voucher assistance is extended to remaining residents. Instead, it has been using interlineated HUD Section 8 Housing Choice Voucher program forms that make no reference to the recorded use restrictions and the

owners' obligations to continue to operate the housing as if it remained in the 515 program and to follow the regulations set out in 7 C.F.R. § 3560.

75. Both the RD HAP contract and the tenancy addendum, in fact, conflict with the remaining resident use restrictions in a variety of ways, including the type of lease that must be used under the voucher program, the subsequent lease term after the initial lease term, the operating costs that the owner may pass on to the voucher holders, and loss of the good cause termination requirements after the initial lease term.

### E. New Mexico Uniform Owner Resident Relations Act

76. The New Mexico Uniform Owner Resident Relations Act (UORRA) is the primary law governing housing rentals in the state. N. M. S. A. 1978, § 47-8-1.

77. The purpose of the Uniform Owner Resident Relations Act is to simplify, clarify, modernize, and revise the law governing the rental of dwelling units and the rights and obligations of owners and residents, and to encourage the owners and the residents to maintain and improve the quality of housing in New Mexico. N. M. S. A. 1978, § 47-8-2.

78. UORRA requires landlords, among other obligations, to:

   a. Make repairs and do whatever is necessary to put and keep the premises in a safe condition as provided by applicable law (N. M. S. A. 1978, § 47-8-20(A)(2));

   b. Keep common areas of the premises in a safe condition (N. M. S. A. 1978, § 47-8-20(A)(3)); and

   c. Maintain in good and safe working order and condition electrical, plumbing, sanitary, heating, ventilating, air conditioning and other

facilities. N. M. S. A. 1978, § 47-8-20(A)(4).

79.    UORRA also requires landlords to substantially comply with requirements of the applicable minimum housing codes materially affecting health and safety. N. M. S. A. 1978, § 47-8-20(A)(1). In Española, the housing code requires, among other things, that:

    a.   Halls and stairways to be lighted (City of Española Gen. Leg., Art. III, §222-8(F));

    b.   When the dwelling or dwelling unit is heated by a central heating system, every heat duct, steam pipe, and hot water pipe is free of leaks and functions so that adequate heat is delivered where intended (City of Española Gen. Leg., Art. III, §222-8(H)(1));

    c.   Every foundation, floor, wall, ceiling, and roof shall be reasonably weathertight, watertight, and rodentproof; shall be capable of affording privacy; and shall be kept in good repair (City of Española Gen. Leg., Art. III, §222-9(D)(1));

    d.   Every floor is free of holes and wide cracks which might admit rodents, or which constitute a possible accident hazard (City of Española Gen. Leg., Art. III, §222-9(D)(2)(b));

    e.   Every interior wall and ceiling is free of holes and large cracks (City of Española Gen. Leg., Art. III, §222-9(D)(2)(e));

    f.   Every window, exterior door, and basement hatchway shall be reasonably weathertight, watertight, and rodentproof, and shall be kept in sound working condition and good repair (City of Española

Gen. Leg., Art. III, §222-9(E));

g.  Every owner of a dwelling containing two or more dwelling units shall be responsible for maintaining in a clean and sanitary condition the shared or public areas of the dwelling and premises thereof (City of Española Gen. Leg., Art. III, §222-11); and

h.  Whenever infestation exists in two or more of the dwelling units in any dwelling, or in the shared or public parts of any dwelling containing two or more dwelling units, extermination thereof shall be the responsibility of the owner (City of Española Gen. Leg., Art. III, §222-16).

80.     UORRA also prohibits unlawful removal by landlords. N. M. S. A. 1978, § 47-8-36(A). The owner, or a person acting on their behalf, is prohibited from threatening or attempting to remove or dispossess a resident without a court order, thus rendering the dwelling unit or any personal property located in the dwelling unit or on the premises inaccessible or unattainable. *Id.* This includes threats or attempts to remove by fraud. N. M. S. A. 1978, § 47-8-36(A)(1).

**F. New Mexico Unfair Trade Practices Act**

81.     New Mexico's Unfair Practices Act (UPA) prohibits unfair, deceptive, and unconscionable trade practices. N. M. S. A. 1978, § 57-12-3. The UPA prohibits methods, acts, and practices, including:

a.  Making false or misleading statements of fact concerning the price or good of a service or the reasons for existence or reasons for the amount of price reduction. N. M. S. A. 1978, § 57-12-2(D)(11);

b. Using exaggeration, innuendo, or ambiguity as to a material fact or
   failing to state a material fact if doing so deceives or tends to
   deceive N. M. S. A. 1978, § 57-12-2(D)(14);

c. Stating that a transaction involves rights, remedies, or obligations
   that it does not involve. N.M. S. A. 1978, § 57-12-2(D)(15); and

d. Failing to deliver the quality or quantity of goods or services
   contracted. N.M. S. A. 1978, § 57-12-2(D)(19).

## V.    FACTS

### A.  The Development of La Vista Del Rio

82.     La Vista Del Rio is a 6-building development located in Española, New Mexico.
The development consists of 49 units: 17 one-bedroom units, 24 two-bedroom units, and 8 three-
bedroom units. It was initially developed by La Vista Del Rio Apartments LP, with a 50-year
USDA loan in the amount of $1,612,000. The loan was made under Section 515 of the Housing
Act of 1949, 42 U.S.C. § 1485, and entered into on April 15, 1985. Exh. 2, La Vista Del Rio
Apartments USDA-FmHA Mortgage.

83.     On information and belief, WHG Partnership, which consisted of John Bosley,
Constance Bosley, and Michael Ryan, was the General Partner of La Vista Del Rio Apartments
LP from 1995-2023.

84.     On information and belief, Bosley Management, Inc. managed La Vista Del Rio
and John Bosely and Constance Bosley were agents of Bosley Management. All but one of the
units at La Vista Del Rio were deeply subsidized under the Section 521 Rental Assistance
program. Before La Vista Del Rio exited the RD multifamily housing portfolio in 2023, the

monthly rents were $675 for a one-bedroom apartment, $795 for a two-bedroom apartment, and $1,000 for a three-bedroom apartment. Exh. 3, Email from John Bosley to Miriam Haylett (Mar. 23, 2023). However, the Plaintiffs, and all other residents receiving rental assistance, only paid 30% of their adjusted income toward rents as set by USDA.

85.     Bosley Management, Inc. operates more than 40 USDA multifamily housing properties located in Arizona, Colorado, Montana, New Mexico, and Wyoming.

**B.  USDA Conducts a Suitability Determination of La Vista Del Rio**

86.     On September 8, 2022, USDA conducted a suitability determination of La Vista Del Rio, which involved an in-person inspection of the property. Following that inspection, USDA completed a Property Categorization Worksheet ("Worksheet") for La Vista Del Rio. Exh. 4, Property Categorization Worksheet.

87.     In making a suitability determination, RD evaluates the property and uses the Worksheet to determine whether the property is still needed in the program. In making its determination, RD considers nine factors: ownership, management, health or safety, physical standards/obsolescence, transition events, revitalization cost vs. new/construction/replacement cost, market demand/vacancy/need, economic viability, and environmental influences.

88.     RD's Handbook contains guidance as to how the Agency is supposed to assess a property with regard to each of these factors.

89.     Properties that RD determines are needed, but too expensive to preserve are designated Category 1 properties. Properties that RD determines are needed and can be preserved are assigned to Category 2. Properties that RD determines are no longer needed in the program as determined by the local affordable housing market or are too expensive for the owner to

maintain as determined by the financial condition of the property are assigned to Category 3.

90.     With regard to ownership, the RD handbook requires RD to assess "whether ownership has been uncooperative and non-compliant with Agency requirements." However, the La Vista Del Rio Worksheet lacks such an assessment.

91.     With regard to management, the RD handbook requires RD to assess "whether the property is experiencing current and/or ongoing problems with property management, either on-site or off-site." However, the La Vista Del Rio Worksheet lacks such an assessment.

92.     With regard to health and safety, the RD handbook advises that most health or safety violations "will never lead to a concern of suitability. For example, broken windows, a leaking roof, or exposed wiring are all easily corrected if funds are available. Health or safety issues that do affect suitability will likely pertain to the entire property and either cannot be repaired, or repair is too costly." Regarding health and safety, the La Vista Del Rio Worksheet identifies, "Missing fire extinguishers, Non-existent or non-illuminated Exit signs. Drug Paraphernalia in exterior areas, windowsills and stairways. Doors and windows are damaged."

93.     With regard to physical standards/obsolescence, the RD handbook requires the Agency to assess "whether there is evidence of physical deterioration and extensive deferred maintenance." However, the La Vista Del Rio Worksheet lacks such an assessment and, instead, contains a conclusory statement that the "[t]own has a crime and drug problem that has led to the demise of the property."

94.     With regard to transition events, the handbook requires RD to assess "whether the property is eligible to prepay the mortgage; is reaching the expiration of tax credit eligibility; or is coming up on the natural maturity of the mortgage." However, the La Vista Del Rio

Worksheet lacks such an assessment.

95.     With regard to revitalization cost vs. new/construction/replacement cost, the

handbook requires RD to assess the cost to rehabilitate the property compared to building a new,

comparable property. It further instructs that the "Agency's share of rehabilitation costs,

including a rehabilitation loan and the cost of revitalization loan tools if available, should not

exceed 50 percent of the cost of new construction." However, the La Vista Del Rio Worksheet

lacks such an assessment, and instead contains a conclusory statement that, "Costs are high due

to vandalism. The borrower fixes items and they are quickly destroyed by vandals. Drug and

crime issues in this town make it a hard property to manage and make cash flow."

96.     With regard to market demand/vacancy/need, the handbook instructs RD to gather

a market study, local economic indicators, the property's updated budget, including a record of

accounts receivable and accounts payable, and community input. However, the La Vista Del Rio

Worksheet lacks any indication that the recommended information was gathered or analyzed.

Instead, the Worksheet contains a conclusory statement that "The property is needed, but the

borrower is unable to make it a safe place to live."

97.     With regard to economic viability, the handbook requires RD to assess "whether

the Borrower's budget, rents and marketing plans are appropriate in accordance with Chapters 4

and 7 of HB-2-3560." The Handbook further instructs RD to determine (1) what special

servicing efforts will be sufficient for the property to be viable; (2) whether, based upon the

market study, local economic conditions will significantly improve in the next one to two years;

and (3) whether the Borrower, given occupancy levels and any servicing actions, can pay

essential expenses, adequately fund accounts, and pay the Borrower's monthly loan payment in

full. However, the La Vista Del Rio Worksheet lacks such an assessment, and instead contains a conclusory statement that "[t]he property does not appear to be economically viable due to the crime and vandalism in the community. The borrower has been unable to make the property a safe place to live."

98.     Despite failing to complete the assessment as prescribed by the Handbook, USDA categorized the property as "Category 1 - needed, but too expensive to preserve."

### C.  USDA Moves Forward with Servicing Actions Against La Vista Del Rio's Owner

99.     On or about September 15, 2022, RD sent a letter entitled "ROUTINE NOTICE OF SERVICING RESULTS/CONCERNS" to WHG Partner and La Vista Del Rio Apartments, LP (hereinafter referred to jointly as "Borrowers") and Bosely Management. Exh. 5, Letter from Miriam Haylett, Multifamily Specialist, USDA Rural Development, to John Bosley, WHG Partner, General Partner, La Vista Del Rio Apartments, LP, Bosley Management of AZ, Inc., Routine Notice of Servicing Results/Concerns (Sept. 15, 2022). The letter documented several "issues of great concern" at La Vista Del Rio that were observed during the USDA inspection on September 8, 2022. Finally, the letter noted that the Borrowers and Bosley Management were in violation of RD regulations and agreements with regard to physical maintenance and preservation of the property.

100.     The Notice required Mr. Bosley, as the agent for the Borrowers and Bosley Management, to contact the office within 15 days to inform RD of the corrective actions taken or planned to correct the areas of concern.

101.     The Borrowers and Bosley Management proposed a Workout Plan (WOP) to USDA on September 26, 2022. In the WOP, they stated they had requested maximum reasonable

rent every year. They also stated that the current occupancy rate was then 81% based on 39 out of 48 units being occupied, and that there were sufficient applicants to fill all vacancies. Exh. 6, Special Servicing Workout Plan (Sept. 26, 2022).

102.    RD did not approve the WOP for a number of reasons including that it did not "provide a timeline of when we can expect all the concerns listed in our first letter will be resolved" and "this property does not appear to be economically viable, without a substantial borrower contribution, considering all of the deferred maintenance and health, sanitary and safety issues that this property poses." Exh. 7, Letter from Miriam Haylett, Multifamily Specialist, USDA Rural Development, to John Bosley, WHG Partner, General Partner, La Vista Del Rio Apartments, LP, Bosley Management of AZ, Inc., Notification of Intent to Pursue More Forceful Servicing Actions - Revised Servicing Letter #3 (Jan. 17, 2023).

103.    On October 14, 2022, RD advised the Borrowers and Bosley Management of the deficiencies in the WOP and requested to discuss them during the October 18, 2022, teleconference that had been scheduled. RD also required that the health and safety noncompliance issues be resolved within 10 days.

104.    The Borrowers and Bosley Management submitted another WOP on or about October 28, 2022.

105.    RD rejected the revised WOP on or about December 9, 2022, for the same reasons that it rejected the initial WOP.

106.    On or about January 13, 2023, the Borrowers and Bosley Management sent USDA a third revised WOP for La Vista Del Rio, and advised RD, "I don't (sic) find regulations that support the requirement of an additional borrower financial contribution to achieve

economic viability." Exh. 8, Email from Miriam Haylett to John Bosley (Jan. 17, 2023).

107.     On January 17, 2023, USDA again denied the proposed WOP submitted by the Borrowers and Bosley Management for the same reasons it rejected the prior WOPs and stated that an owner contribution may be necessary because the property was not eligible for a Multifamily Preservation and Revitalization Loan. USDA stated further action would be taken, including potentially suing for specific performance, if the Borrowers and Bosley Management did not get them a satisfactory plan within 15 days. Exh. 7.

### D. RD's Unlawful Prepayment Approval of LVDR and Subsequent Actions and Omissions

108.     On March 17, 2023, RD emailed La Vista Del Rio Apartments, LP an acceleration notice for La Vista Del Rio, which also advised of its right to appeal the acceleration decision. Exh. 9, Email from Miriam Haylett to John Bosley (Mar. 17, 2023). In the email, RD further advised that "[t]o avoid foreclosure, it will be necessary that you extend all leases for 6 months, sign the Restrictive Use provision, and pay the property in full." *Id*.

109.     Upon information and belief, the March 17, 2023, Notice advised La Vista Del Rio Apartments, LP that its failure to comply with the prepayment requirements, submit payment in full or comply with any arrangements agreed to with RD, will not cancel the effect of the notice. In addition, any such payment is subject to agency regulations governing payments in full.

110.     No notice regarding the loan acceleration was sent to the residents of La Vista Del Rio.

111.     By failing to notify the residents of the loan acceleration, RD effectively denied

them their right to appeal either the loan acceleration or prepayment decisions. In addition, RD's failure limited the residents' participation in an appeal to one filed by the property owner, and here, the owner did not file an appeal.

112.    Contrary to its obligation under ELIHPA, RD did not notify the tenants prior to its decision to approve the prepayment of La Vista Del Rio's loan.

113.    In accordance with ELIHPA, RD conditioned the prepayment of La Vista Del Rio's Section 515 loan on use restrictions being placed on the property.

114.    The restrictive use covenant that was executed for La Vista Del Rio is used for properties that have been approved to prepay where RD found under ELIHPA that prepayment would have no impact on minorities but there is not an adequate supply of housing. In other words, RD's approval of La Vista Del Rio's prepayment subject to use restrictions, means that pursuant to ELIHPA, RD must have found that there was no material impact on minority housing opportunities, but that there was a need for comparable affordable housing in the community.

115.    On information and belief, RD found that there was no material impact on minority housing opportunities even though:

- According to U.S. Census Bureau estimates for Española in 2020, of the 10,526 persons residing in Española, 83% were Hispanic, 2.8% were Native American, and 1% were Asian. The Census also estimated that 18.9% of Española lives below the poverty line, including 20.1% of Native Americans and 19.6% of Latinos.

- As of March 17, 2023, 97% of La Vista Del Rio's 63 residents were Hispanic.

- As of September 17, 2023, 94% of La Vista Del Rio's 35 residents were Hispanic.

116.    On information and belief, pursuant to ELIHPA, RD determined that there was

insufficient alternative affordable housing around Española to house RD residents.

117.     In fact, on November 15, 2022, RD performed an Area Market Rent Study for Española, New Mexico, and found the vacancy rate to be very low in the area. Exh. 10, Area Market Rent Study for Española, New Mexico. The Study found only a single one-bedroom available for rent, which was in a mobile home and being advertised at $1,050 per month, which was nearly double the $675 rent for a one-bedroom apartment at La Vista Del Rio. The study found only a single available two-bedroom unit for rent in Española, which was in a mobile home and being advertised at $1,200 per month, nearly double the $795 rent being charged for a two-bedroom apartment at La Vista Del Rio. Other than those two rooms, the closest unit available for rent was a half-hour drive away in Embudo, a town with no grocery stores or schools.

118.     The three closest RD multi-family developments are located in Taos which is 45 miles and approximately over an hour drive away. On information and belief, there were waitlists at all these RD developments.

119.     Similarly, a 2022 New Mexico Mortgage Finance Authority Report noted that despite being a hub for rural communities, Española has an aging housing stock with most apartments built in the 1970s, and no Low-Income Housing Tax Credit housing built in over 20 years.

120.     On information and belief, RD approved the La Vista Del Rio prepayment without notifying the residents that it had determined that the prepayment will not have a material or disproportional impact on minority housing opportunities and that, because there was inadequate affordable housing in the community, the owner could only prepay the RD loan

subject to use restrictions protecting the current tenants.

121.    On information and belief, RD never held a tenant meeting at La Vista Del Rio after it approved the prepayment of the RD loans.

122.    Pursuant to the settlement agreement in *Acosta v. Vilsack*, on September 27, 2023, RD updated its notices to tenants to advise them that:

> If the owner was approved to pay the USDA loan in full <u>with</u> a restrictive use covenant…, until you voluntarily move, your rent will continue to be calculated in the same manner as it was prior to the owner paying the USDA loan in full.
>
> Regardless of whether you apply for and receive a Rural Development Voucher, the restrictive use covenant provides you the right to pursue legal enforcement of the recorded restrictive use covenant, until released by USDA.

123.    On information and belief, since the beginning of Fiscal Year 2006, RD has never developed a form letter to owners of Section 515 developments that have been prepaid subject to use restrictions that detail their obligation to set and maintain rents for residents who received Rental Assistance prior to the prepayment in accordance with RD regulations that set and maintain their rents at 30% of adjusted household income.

### E.  RD Offers RD Vouchers To La Vista Del Rio Residents Due to Prepayment

124.    On March 18, 2023, an internal message between USDA employees requested exceptional authority to offer RD Vouchers and Letters of Priority Entitlement (LOPE) to La Vista Del Rio tenants prior to the mortgage pay off. Exh. 11, Email from Miriam Haylett to Robert Hawkes and Becki Meyer (Mar. 18, 2023). On or about March 21, 2023, RD notified La Vista Del Rio tenants that "the prepayment or foreclosure of your apartment complex occurred on 03/17/2023." Exh. 12, Letter from USDA Rural Development to Larry Mondragon, Rural

Development Voucher Information – Eligibility and Voucher Amount Determination (Mar. 21, 2023) and USDA Rural Development to Guadalupe Chavez, Rural Development Voucher Package (Apr. 26, 2023).

125.     The March 21, 2023, letter further explained that tenants' rents may increase, that they may be eligible for a LOPE to move to other USDA housing, that they may transfer their rental assistance if they move to another USDA property, or that they may be eligible for RD Vouchers. However, the letter fails to mention anything about the use restrictions, which require that tenants benefit from the same terms and conditions they have under the 515 and Rental Assistance programs, including the automatic renewal of their existing 12-month leases.

126.     Prior to receiving the notice from RD, Bosley Management sent a letter to residents dated March 15, 2023, which advised that the apartment complex would be closed starting April 1, 2023, due to crime. The letter stated that the doors would be locked and that the utilities would be shut off. Exh. 13, Notice from La Vista Del Rio Apartments, LP to Residents re: Closure of Complex (Mar. 15, 2023).

127.     RD's March 21, 2023, letter did not advise the residents that they should ignore the March 15, 2023 letter from Bosley Management that the property would be closing and the doors would be locked.

128.     On or about March 22, 2023, RD sent the Borrowers a cease-and-desist letter with regard to the March 15, 2023 notice advising tenants to vacate La Vista Del Rio.

129.     On March 23, 2023, La Vista Del Rio Apartments, LP sent a letter notifying the residents of La Vista Del Rio that "Rural Development demands that this complex remain open," but advised them to still vacate their apartments, and stated residents would be "totally

responsible" for their safety. By that time, only 34 units were occupied. Exh. 14, Notice from La

Vista Del Rio Apartments, LP re: Closure of Complex Cancelled (Mar. 23, 2023).

130.     That same day, residents from La Vista Del Rio organized a community meeting

with state and county officials, staff members from the New Mexico congressional delegation,

and local housing advocates. USDA was invited to, but did not, attend this meeting.

131.     On October 8, 2023, USDA RD sent a letter to tenants who had not completed an

RD Voucher Request for Tenant Approval. It stated that tenants must complete and return those

documents by October 23, 2023 "in order to receive a (sic) housing assistance."

132.     Due to the conflicting information that they received from RD and the Borrowers,

residents were unsure whether they were going to have to leave their homes.

### F.  The Prepayment and Sale of La Vista Del Rio

133.     On information and belief, neither the Borrowers nor RD ever publicly listed the

complex for sale and did not contact any nonprofit organizations or public bodies about

purchasing the property. However, at least three offers were made to purchase La Vista Del Rio.

134.     First, on March 23, 2023, the CEO of the Española Pathways Shelter, Cristian

Madrid, contacted John Bosley (Mr. Bosely) to inquire about purchasing La Vista Del Rio.

Española Pathways Shelter sought to purchase the property because of the desperate need for

affordable housing in Española. They hoped to preserve this important supply of affordable

housing and reduce the risk of increased homelessness.

135.     Second, the City of Española also attempted to buy the property, and on March

30, 2023, Mr. Bosley sent USDA an offer from the City to purchase La Vista Del Rio.

136.     Third, on April 10, 2023, Mr. Bosley sent RD offers from Isaac Sandoval of

Lucred Investments to purchase La Vista Del Rio and Santa Clara Apartments.

137.    On April 11, 2023, Mr. Bosley accepted the offer submitted by the City of Española to purchase La Vista Del Rio.

138.    On or about April 12, 2023, Isaac Sandoval withdrew his offer to purchase La Vista Del Rio upon learning that the Borrowers had already signed a purchase agreement for La Vista Del Rio with the City of Española.

139.    On April 13, 2023, the City of Española informed the residents of La Vista Del Rio that they had purchased the property, and that residents did not need to leave the property. However, on August 22, 2023, the Española City Council voted to not purchase the property.

140.    On August 25, 2023, the Borrowers entered into a purchase agreement to sell La Vista Del Rio to La Vista Del Rio 1 LLC for $550,000. Exh. 15, Purchase Agreement Offer (Aug. 25, 2023).

141.    On or about August 30, 2023, the building manager, Adela Y. Cordova, told residents that they would have to leave the property by the end of the week.

142.    On September 6, 2023, Mr. Bosley signed a Restrictive Use Covenant (use restriction) regarding the La Vista Del Rio Apartments, which was recorded by the Santa Fe County Clerk on October 23, 2023. The use restriction is for properties that have been approved to prepay where RD found that prepayment would have no impact on minorities but there is not an adequate supply of housing. Exh. 16, Restrictive Use Covenant (Sept. 6, 2023).

143.    The use restriction contains a use requirement and states in relevant part that:

    a.  "The Owner, and any successors in interest, agree to use the Property

        in compliance with 42 U.S.C. 1484 or 1485, whichever is applicable,

and 7 CFR Part 3560, and any other applicable regulations and amendments, for the purpose of housing program eligible very low-, low-, or moderate income tenants."

b. "The Agency and program eligible tenants or applicants may enforce these restrictions as long as the Agency has not terminated the Restrictive Use Agreement."

144. On or about September 15, 2023, La Vista Del Rio 1 LLC purchased La Vista Del Rio for $550,000 and assumed the existing residential leases. Exh. 15. Shortly thereafter they transferred ownership to Manzanilla Villa Española Valley, LLC. Exh. 17, Warranty Deed (Sept. 25, 2023).

145. On or about September 26, 2023, RD advised the residents of La Vista Del Rio that it had accelerated the loan and received the final mortgage payment of the debt owed to the government, and that residents could apply for RD Vouchers to assist them in paying the rent and apply for a LOPE. Exh. 18, Letter from USDA Rural Development to Guadalupe Chavez (Sept. 26, 2023). In this letter, RD also advised residents that it had "filed a 'Restrictive Use Covenant – The Last Existing Tenant' protecting the tenants who are living at the property on the day the USDA loan was paid in full." The letter further advised that "protected tenants' rents will continue to be calculated as if the property were still in the Rural Development program, for as long as the tenant continues to live at the property. The owner also has agreed to keep the apartment a suitable place to live. Any tenant, as well as Rural Development, may enforce the restrictive use covenant."

146. The letter stated that tenants only had ten months from the date of the loan

payment to request a voucher.

147.     However, the letter did not state that the residents have a right to appeal RD's decisions to accelerate the loan or to allow the prepayment of the loan.

### G.  Post-Sale Ownership and Communications with Plaintiffs

148.     On information and belief, the development was purchased and quickly passed between three LLCs with similar membership. All three of these LLCs had a mailing address of 1910 Avenida Canada, Española, NM 87532, which is also the address of the domicile of James and Jennifer Gomez.

149.     La Vista Del Rio was transferred from La Vista Del Rio 1 LLC to Manzana Villa Española Valley LLC. Manzana Villa Española Valley LLC consisted of members: James Gomez; Jennifer Gomez Robert Montoya; Chad Williams; and Andrew Gallegos.

150.     On September 16, 2023, Manzana Villa issued a press release which stated, "[w]e will continue to provide housing for all existing law-abiding tenants in good standing for as long as they wish to reside at the apartments. To help achieve this commitment to our tenants, the company will be offering a limited number of reduced rate units for members of law enforcement." The letter also stated the LLC intended to continue working with USDA. Exh. 19, Press Release, Manzana Villa, Manzana Villa Announces the acquisition of the La Vista Del Rio Apartment Complex in Española, NM (Sept. 16, 2023).

151.     On September 25, 2023, the complex was conveyed from Manza Villa Española LLC to Villas de Avenida Canada, LLC. James Gomez, Jennifer Gomez, and Chad Williams created Villas de Avenida Canada, LLC.

152.     Despite the presence of the use restrictions protecting tenants from rent increases

and evictions without cause, the manager has repeatedly threatened tenants with increased rent and eviction.

153.    For example, Defendant Villas de Avenida Canada and their agents told Ms. Romero and Ms. Velarde that their rent would increase if they did not secure additional assistance from USDA, and that they were running out of time to receive vouchers from USDA. Ms. Romero and Ms. Velarde cannot afford to pay a higher rent amount.

154.    Plaintiffs have made multiple requests to Defendant Villas de Avenida Canada and their agents regarding the habitability conditions that exist within the common areas and individual apartments at La Vista Del Rio. Defendant Villas de Avenida Canada have failed to make repairs at apartments, including apartments where the resident obtained an RD voucher. There are still many issues in the common areas, including piles of trash, lack of lighting, missing or outdated fire extinguishers, doors that do not seal properly, and cockroach infestation. At the same time, most, if not all, of the vacant apartments have been renovated and are in the process of being rented to new tenants and security cameras have been installed in the hallways.

155.    Defendant Villas de Avenida Canada has retained the same building manager employed by the prior owners.

156.    Ms. Romero has a hole in her wall, a stove that is not functional, heat that does not work in some rooms, and a cockroach infestation.

157.    Ms. Velarde has persistent mold that cannot be abated by constant cleaning and is impacting her children's health. Her apartment does not have functioning smoke detectors, a working air conditioner, or a weatherproof door. Her home also has large holes in the flooring. The electric often goes out, and always goes out if she attempts to turn on the air conditioning.

158.     Ms. Velarde sent a letter to defendant Villas de Avenida Canada requesting a meeting to settle a dispute in accordance with 7 C.F.R. § 3560.160.

159.     On March 21, 2024, a meeting was held with Ms. Velarde and James Gomez of Villas de Avenida Canada. At that meeting, Ms. Velarde again requested that she be moved to a new apartment due to the issues in her apartment. Mr. Gomez agreed to move her to a new apartment as soon as possible, acknowledging the mold was an issue that needed to be fixed. He also stated that the mold was being removed in the renovated apartments. However, Mr. Gomez failed to move Ms. Velarde or remedy the conditions at the apartment. Instead, he rented the apartment to a new market rate tenant. At the grievance meeting Ms. Velarde also requested that defendant Villas de Avenida Canada stop threatening rent increases that would violate the restrictive use covenant. The owner agreed to stop the threats, yet has continued to tell other tenants that their rent will be increased to market value when their lease is renewed.

160.     Villas de Avenida Canada has filed in New Mexico state magistrate court to evict Ms. Velarde due to her refusal to obtain an RD voucher.

161.     RD has approved the use of RD vouchers for multiple tenants who have remained in the apartments, including Ms. Romero.

162.     Tenants, including Ms. Romero, only applied for an RD voucher due to threats by the landlord to raise rent.

163.     RD conducted a virtual inspection of Ms. Romero's apartment, and subsequently approved her to use a voucher at her current unit, even though the approved apartments have ongoing habitability issues which in part triggered RD's loan acceleration. No issues have been fixed at Ms. Romero's apartment. She still has a hole in her wall, a stove that does not work, heat

that does not work, and outlets that do not work.

164.    Federal Defendant and Villas de Avenida Canada required Ms. Romero to sign a new lease to receive the RD Voucher. The new lease denies her the protections she received under the Section 515 program and restrictive use covenant. The new lease also does not protect Ms. Romero from eviction at the end of her lease term. Further, Ms. Romero's rent increased nearly 70% to $360 per month after signing the lease. Exh. 20, Form Residential Lease, Villas de Avenida Canada.

165.    On or about April 16, 2024, Plaintiff Chavez received a letter from USDA RD stating that his voucher assistance was being terminated as of that date.

166.    Plaintiffs have substantially performed and complied with the terms of their residential leases.

167.    Plaintiffs have no adequate remedy at law with respect to any of their claims.

### H.  Class Action Allegations

168.    Named Plaintiffs Guadalupe Chavez, Lorenza Romero, Alice Sanchez, Susie Trujillo, and Petra Velarde bring this action on behalf of themselves and all others similarly situated pursuant to Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure. The proposed 23(b)(2) and (b)(3) class is defined as, "All current and former residents of La Vista Del Rio Apartments since September 8, 2022, who are or were eligible to receive low-income housing assistance under the United States Department of Agriculture's Sections 515 and 521 Programs."

169.    Numerosity. The class is so numerous that joinder of all members is impracticable. Upon information and belief, the class is comprised of at least 70 individuals. The

putative class members are unlikely to press their claims on an individual basis because as residents of low-income affordable housing, all putative class members have limited incomes, and therefore limited access to legal counsel to have their claims redressed.

170.    Commonality and Predominance. Common questions of fact and law predominate over questions affecting individual class members. Defendants are expected to raise common defenses to these claims, including denying that their actions violated the law. Questions of law and fact common to the class include:

a.   Whether USDA properly authorized the prepayment of the USDA 515 loan consistent with 42 U.S.C. § 1472(c)(5)(G)(ii);

b.   Whether the USDA acted in concert with the obligations to notify residents and offer them an opportunity to appeal any 515 loan acceleration or loan prepayment as set forth in 42 U.S.C. § 1480(g), 7 U.S.C. § 6991 and USDA regulations published at 7 C.F.R. Part 11 and consistent with the Due Process Clause of the 5th Amendment;

c.   Whether the Private and Federal Defendants acted in accordance with the federally imposed use restrictions and 42 U.S.C. § 1485 and its implementing regulations with respect to strictly leasing to low-income households, setting shelter costs for residents, rent increases, and for cause eviction protections; and

d.   Whether the Private Defendants breached the residential leases and violated state law with the class members by not maintaining

habitable conditions, threatening to withhold services, issuing

notices to move out without cause, and threatening rent increases.

171.     Typicality and Adequacy. The Plaintiffs' claims are typical of the class as a

whole. All of the Plaintiffs' claims arise from the same unlawful policies and practices: USDA

and the Private Defendants' failure to abide by the federally mandated prepayment requirements

for USDA's Section 515 program, including the restrictive use covenant imposed as a result of

the prepayment. The Plaintiffs do not present claims that are unique to themselves and instead

bring claims typical to the class. Proposed class representatives and class counsel will fairly and

adequately protect the interests of the class as a whole. Plaintiffs do not have any interests

antagonistic to those of other class members. By filing this action, Plaintiffs have displayed an

interest in vindicating their rights, as well as the claims of others who are similarly situated.

Plaintiffs are represented by experienced counsel.

172.     Superiority. A class action is superior to other available methods for the fair and

efficient adjudication of this controversy because it will: (a) avoid the heavy burden of multiple,

duplicative suits; (b) avoid the virtually impossible task of getting all class members to intervene

as party-plaintiffs in this action; (c) allow the Court, upon adjudication of Defendants' liability,

to determine the claims of all class members; and (d) allow the Court to enter appropriate final

monetary relief with respect to the class as a whole.

173.     Injunctive and Declaratory Relief. The Defendants have acted or refused to act on

grounds that apply generally to the Rule 23(b)(2) class as a whole, so that final injunctive or

declaratory relief is appropriate respecting the class as a whole. More specifically, Federal and

Private Defendants have unlawfully moved forward on the prepayment of the 515 loan, which

has jeopardized the housing and housing affordability of the class.

## VI.   CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

**Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2) Against Federal Defendant**

**RD's Decision to Accelerate the Loan for La Vista Del Rio Was Arbitrary and Capricious and Contrary to Law**

174.     Plaintiffs incorporate by reference paragraphs 1-59, 82-123 and 168-173 of this Complaint as though fully set forth herein.

175.     In deciding whether the property should exit the program and the loan should be accelerated, RD failed to appropriately assess the nine factors contained in the Agency's Handbook: ownership, management, health or safety, physical standards/obsolescence, transition events, revitalization cost vs. new/construction/replacement cost, market demand/vacancy/need, economic viability, and environmental influences.

176.     Contrary to the Agency's Handbook, which advises that a property classified as Category 1 should be assessed to determine whether the property qualifies for prepayment, USDA determined that the appropriate servicing strategy for La Vista Del Rio was loan acceleration.

177.     RD's regulations provide that the Agency will consider whether the borrower is forcing an acceleration to avoid the prepayment process under ELIHPA. 7 C.F.R. § 3560.456(a).

178.     If the borrower is seeking to avoid the prepayment process, then RD will consider alternatives other than acceleration.

179.     On information and belief, the Agency did not determine whether the owner of La

Vista Del Rio was forcing an acceleration to avoid the prepayment process.

180.    On information and belief, the Agency did not consider alternatives other than acceleration.

181.    The Agency's practices are arbitrary and capricious, not in accordance with the law, and must be set aside in accordance with 5 U.S.C. § 706(2).

## SECOND CLAIM FOR RELIEF

**Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2) Against Federal Defendant**

**RD's Failure to Determine the Impact of Prepayments on Minority Housing Opportunities Was Arbitrary and Capricious and Contrary to Law**

182.    Plaintiffs incorporate by reference paragraphs 1-59, 82-85, 108-123, 133-147 and 168-173 of this Complaint as though fully set forth herein.

183.    After it accelerated the loan, the Agency assessed La Vista Del Rio for prepayment in accordance with ELIHPA and RD's regulations and handbooks.

184.    After accelerating the loan for La Vista Del Rio, the Agency took servicing actions in line with a prepayment under ELIHPA by:

> a.  Sending letters to La Vista Del Rio residents on March 21, 2023, and September 26, 2023 that they were eligible for RD Vouchers due to the prepayment of the loan;
>
> b.  Conducting a market analysis to determine whether there was an adequate supply of housing in or near Santa Fe, New Mexico; and
>
> c.  Conditioning the prepayment on use restrictions and having the borrower execute the Restrictive Use Covenant for prepayments

that is used where there is "No Impact on Minorities but There is
Not an Adequate Supply of Housing."

185.    The Agency deviated from its obligations under ELIHPA, RD regulations and the
handbook by failing to properly determine whether the prepayment would "disproportionately
adversely affect" minority housing opportunities.

186.    Had it properly determined that the prepayment would disproportionately
adversely affect minority housing opportunities, the Agency would have been obligated to allow
the owner to sell La Vista Del Rio to a new owner who was willing to continue to operate it as
affordable housing under the Section 515 program.

187.    The Agency violated 5 U.S.C. § 706(2) by:

  a. Applying regulations that are inconsistent with the requirement of
   42 U.S.C. § 1472(c)(5)(G)(ii), which only allows RD to approve an
   owner's prepayment upon a determination that the prepayment
   would not "materially affect" minority housing opportunities; and

  b. Approving the owner's prepayment upon a faulty and unlawful
   determination that the prepayment would not "disproportionately
   adversely affect" minority housing opportunities 7 C.F.R.
   3560.658(b).

  c. Allowing the sale of the property to a new owner who failed to
   operate the property in accordance with Section 515 and that
   resulted in the termination of all subsidies to the property.

188.    The Agency's actions are arbitrary and capricious, not in accordance with the law,

and must be set aside in accordance with 5 U.S.C. § 706(2).

## THIRD CLAIM FOR RELIEF

**Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2) Against Federal Defendant**

**RD Violated Plaintiffs' Regulatory, Statutory, and 5th Amendment Due Process Rights**

189.     Plaintiffs incorporate by reference paragraphs 1-59, 82-85, 108-123, 133-147, and 168-173 of this Complaint as though fully set forth herein.

190.     42 U.S.C. § 1480(g), 7 U.S.C. § 6991, and USDA regulations published at 7 C.F.R. Part 11 A require RD to give persons, including tenants, whose assistance is denied, reduced or terminated, written notice of the reasons for the denial, reduction or termination of assistance and must provide them the right to appeal the adverse decisions made by agency staff to the U.S.D.A. National Appeals Division (NAD).

191.     The Agency violated 5 U.S.C. § 706(1) and (2) by:

    a.   Failing to advise the residents of the Agency's decisions to accelerate the loan for La Vista Del Rio and allow the owner to prepay the loan;

    b.   Withholding the residents' right to appeal the Agency's decision to accelerate the loan by not informing them of their due process rights under 7 U.S.C. § 6991, 42 U.S.C. § 1480(g), and 7 C.F.R, Part 11;

    c.   Withholding the residents' right to appeal the agency's decision to approve the prepayment of La Vista Del Rio by not informing

them of their due process rights under 7 U.S.C. § 6991, 42 U.S.C.

§ 1480(g), and 7 C.F.R, Part 11; and

    d.   Failing to provide residents with their 5th Amendment

Constitutional right to due process.

192.    Federal Defendant's actions violated plaintiffs' statutory, regulatory and

constitutional due process rights, and must be set aside in accordance with 5 U.S.C. § 706(2).

## FOURTH CLAIM FOR RELIEF

### Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2) Against Federal Defendant

### RD's Administration of the Rural Voucher Program is Contrary to Law and Arbitrary and Capricious

193.    The Plaintiffs incorporate by reference paragraphs 1-59, 82-85, 122-132, and 148-173 of this Complaint as though fully set forth herein.

194.    The Agency violated 5 U.S.C. § 706 by:

    a.   Engaging in a pattern and practice of issuing RD vouchers to

residents remaining in developments that are prepaid subject to use

restrictions, without regard to whether under the Agency's current

implementation of the RD Voucher program, the remaining

residents face displacement or financial hardship by staying in the

prepaid development, in violation of ELIHPA's prepayment

restrictions.

    b.   Requiring the use of an interlineated HUD Section 8 voucher HAP

contract and tenancy addendum that, in cases of prepayments made

subject to use restrictions, violate these restrictions and the rights
the residents that are guaranteed under RD regulations codified at 7
C.F.R. §§ 3560.156-160.

195.    The Agency also operates the voucher program in an arbitrary and capricious

manner, in violation of 5 U.S.C. § 706, by not providing resident with a copy of the voucher

guide or otherwise ensuring that both residents and owners have a clear and full understanding of

the options residents have for staying in their homes including the residents' right to remain in

their units under their current leases subject to use restrictions:

196.    The Federal Defendants' practices violate 5 U.S.C. § 706(2) because they are

contrary to law and arbitrary and capricious.

## FIFTH CLAIM FOR RELIEF

**Breach of Contract, Violation of New Mexico's Unfair Trade Practices Act, and New
Mexico's Uniform Owner Resident Relations Act Against Defendant Villas de Avenida
Canada by All Plaintiffs**

### Villas De Avenida Canada Made Unlawful Threats of Rent Increases

197.    Plaintiffs incorporate by reference paragraphs 1-85, 124-173 of this Complaint as

though fully set forth herein.

198.    Owners of Section 515 developments that have been prepaid subject to use

restrictions are obligated to maintain rents for residents who received Rental Assistance prior to

the prepayment in accordance with RD regulations that set and maintain their rents at 30% of

adjusted household income.

199.    Defendant Villas de Avenida Canada violated the 2023 Use Restriction, N.M.S.A.

1978, § 57-12-3, the Plaintiffs' leases, and N.M.S.A. 1978 § 47-8-36 when they threatened to

increase Plaintiffs' rent and insisted that the Plaintiffs secure RD Vouchers even though:

    a.  The 2023 Use Restriction requires that Defendant Villas de Avenida Canada continue to operate La Vista Del Rio as RD Section 515 affordable housing (consistent with 42 U.S.C. § 1485 and its implementing regulations) for very-low, low, and moderate-income residents and applicants and the 2023 Use Restriction requires the owner to operate the housing as Section 515 affordable housing for the benefit of income eligible residents;

    b.  The residential leases bar the threatened rent increases or changes in the terms of their tenancies;

    c.  N.M.S.A. 1978, § 57-12-2(D), prohibits making false or misleading statements of fact concerning the price or good of a service or failing to state a material fact if doing so deceives or tends to deceive and prohibits failing to deliver the quality of goods or services contracted; and

    d.  N.M.S.A. 1978, § 47-8-36(A), prohibits threats or attempts to remove a resident by the landlord without a court order.

200.    As residents of a development prepaid subject to use restrictions, Plaintiffs gain no financial or material benefit from securing an RD Voucher. Plaintiffs who are forced to secure RD Vouchers will ultimately pay more for their shelter costs and have to enter into new leases subject to a Housing Assistance Payment Contract and Tenancy Addendum, which strip them of rights guaranteed under their current leases and use restrictions imposed on September 6, 2023.

## SIXTH CLAIM FOR RELIEF

**Breach of Contract and Violation of New Mexico's Uniform Owner Resident Relations Act Against Private Defendants**

**Private Defendants Failed to Maintain the Property in a Decent, Safe and Sanitary Manner**

201.    Plaintiffs incorporate by reference paragraphs 1-85, 99-107, and 133-173 of this Complaint as though fully set forth herein.

202.    Private Defendants violated the 2023 Use Restriction, N.M.S.A. 1978, § 47-8-20, and the Plaintiffs' leases when they failed to maintain the property in a decent, safe and sanitary manner.

203.    New Mexico's UORRA, N.M.S.A 1978 § 47-8-20, requires Private Defendants to substantially comply with minimum housing codes, keep the premises and common areas in safe condition, and maintain in working order electric, ventilation, air condition, and other facilities.

## SEVENTH CLAIM FOR RELIEF

**Breach of Contract and Violation of New Mexico's Unfair Trade Practices Act and New Mexico's Uniform Owner Resident Relations Act Against Defendant Bosley Management**

**Bosley Management Provided Fraudulent Notice of Eviction and Diminution of Services**

204.    Plaintiffs incorporate by reference paragraphs 1-85, 124-132, and 168-173 of this Complaint as though fully set forth herein.

205.    Section 515 owners cannot evict a tenant without good cause and the use restriction requires that the residential leases automatically renew annually.

206.    Defendant Bosley Management sent a letter to residents advising that the apartment complex would be closed "due to crime", that the doors would be locked, and that the utilities would be shut off.

207.    Defendant Bosley Management did not have good cause to evict every tenant living at La Vista Del Rio.

208.    Moreover, any eviction of tenants must be done in accordance with state law.

        a.    New Mexico's Unfair Practices Act (UPA), N. M. S. A. 1978, § 57-12-2(D), prohibits failing to deliver the quality of goods or services contracted.

        b.   New Mexico's Uniform Owner Resident Relation Act, N. M. S. A. 1978, § 47-8-36(A), prohibits threats or attempts to remove a resident by the landlord without a court order.

209.    As a result of Defendant Bosley Management's actions, residents feared that whether they had to vacate their homes before their leases ended or food cause requirements were met.

210.    As a result of Defendant Bosley Management's actions, many residents moved out of their homes.

## VII.    PRAYER FOR RELIEF

A.  A declaratory judgment pronouncing that:

    i.    The actions and omissions of Federal Defendant are arbitrary, capricious, and otherwise not in accordance with the law and without observance of procedure required by law under the USDA statutes, implementing regulations, and handbooks, in violation of the Administrative Procedure Act, 5 U.S.C. § 706;

    ii.   Federal Defendant's prepayment regulations applying a disproportionate effect rather than a material effect on minority housing opportunities, are unlawful and

invalid as contrary to ELIHPA, 42 U.S.C. § 1472(c)(5), and in violation of the Administrative Procedure Act, 5 U.S.C. § 706;

iii.    The actions and omissions of Federal Defendant violate the Fifth Amendment to the U.S. Constitution, 7 U.S.C. § 6991, 42 U.S.C. § 1480(g), and 7 C.F.R. Part 11;

iv.    Federal Defendant's use of the interlineated HUD Section 8 Voucher HAP contract and tenancy addendum violate the use restriction and the owner's obligation to operate the housing consistent with the requirement of 42 U.S.C. § 1485 and RD Regulations published at 7 C.F.R. Part 3560;

v.    Federal Defendant's actions and omissions with respect to the operation of the Voucher Program are contrary to law and otherwise arbitrary and capricious;

vi.    Federal Defendant's acts and omissions are in violation of the 2023 Use Restrictions;

vii.    The 2023 Use Restrictions remain in full force and effect;

viii.    Defendant Villas de Avenida Canada's actions and omissions are in violation of the 2023 Use Restrictions;

ix.    Private Defendants' actions and omissions violate the Plaintiffs' residential lease, and New Mexico state law, N.M.S.A 1978 § 47-8-20, N.M. S. A. 1978 § 47-8-36, N.M. S. A. 1978 § 57-12-2.

B.  Enter a preliminary and permanent injunction, without bond, enforcing those declarations and requiring:

i.    The operation of La Vista Del Rio in conformance with the 2023 Use Restrictions, and all statutes and regulations applicable to Section 515 housing,

including regulations set out at 7 C.F.R Part 3560, including without limitation complying with setting shelter costs (rent plus tenant-paid utilities) to reflect no more than 30% of the tenant's adjusted monthly income, rent increase limitations, for cause eviction protections, tenant grievance rights, and other tenant protections;

ii. Federal Defendant not to apply the standards set forth in the prepayment regulations, 7 C.F.R. § 3560.658(b), to the extent that they are inconsistent with the Federal Defendant's obligations to ensure that there is no material effect on minority housing opportunities as a result of a prepayment;

iii. Defendant Villas de Avenida Canada's compliance with the terms of the Plaintiffs' residential leases, including protecting them from eviction without cause, displacement, termination of utility allowances, and rent increases beyond 30% of adjusted household income for shelter costs (rent plus tenant-paid utilities);

iv. Defendant Villas de Avenida Canada to cease mandating that the Plaintiffs secure an RD Voucher or face the threat of a rent increase or enter a new lease with terms inferior to and in conflict with the 2023 use restriction;

v. If a Plaintiff has been issued an RD Voucher but has not entered into a lease agreement with Defendant Villas de Avenida Canada, the Agency shall indefinitely postpone the date by which the Plaintiff must enter into a lease and execute the interlineated HUD Section 8 Voucher HAP contract and tenancy addendum with Defendant Villas de Avenida Canada if the Plaintiff chooses to

remain in their home;

vi.   Federal Defendant cease the use of the interlineated HUD Section 8 Voucher HAP contract and tenancy addendum, including requiring the execution of these documents as a condition of the Plaintiffs using an RD Voucher;

vii.    Federal Defendant to stop administering the RD Voucher program in a manner that is contrary to law and otherwise arbitrary and capricious; and

viii.   Private Defendants and any other entity or person acting on their behalf shall be restrained from offering to lease or leasing units at La Vista Del Rio Apartments to market rate tenants or tenants otherwise not eligible for Section 515 housing in violation of the 2023 use restrictions.

C.  Award Plaintiffs monetary damages against Defendants Villas de Avenida Canada and Bosley Management;

D.  Award Plaintiffs actual and statutory damages against Defendants Villas de Avenida Canada and Bosley Management pursuant to N. M. S. A. 1978, § 57-12-10(E);

E.  Award Plaintiffs actual and punitive damages against Defendants Villas De Avenida Canada and Bosley Management for breach of contract and breach of covenant of good faith and fair dealing;

F.  An award of Plaintiffs' costs and reasonable attorney's fees; and

G.  Such other and further legal and equitable relief as this Court deems just and proper.

Dated: June 6, 2024                    Respectfully submitted,

                                       /s/ Wolfgang Bomgardner
                                       Wolfgang Bomgardner
                                       Attorney for Plaintiffs

NEW MEXICO CENTER ON LAW & POVERTY
301 Edith Blvd. SE
Albuquerque NM 87102
TEL: (505) 244-2840
FAX: (505) 300-2785
E-MAIL: wolf@nmpovertylaw.org

/s/ Maria Griego
Maria Griego
Attorney for Plaintiffs
NEW MEXICO CENTER ON LAW & POVERTY
301 Edith Blvd. SE
Albuquerque NM 87102
TEL: (505) 244-2840
FAX: (505) 300-2785
EMAIL: maria@nmpovertylaw.org

/s/ Natalie N. Maxwell
Natalie N. Maxwell
Attorney for Plaintiffs
NATIONAL HOUSING LAW PROJECT
1663 Mission St., Suite 460
San Francisco, CA 94103
TEL: (415) 546-7000
FAX: (415) 546-7007
E-MAIL: nmaxwell@nhlp.org
*Pro Hac Vice*

/s/ Katherine E. Walz
Katherine E. Walz
Attorney for Plaintiffs
NATIONAL HOUSING LAW PROJECT
1663 Mission St., Suite 460
San Francisco, CA 94103
TEL: (415) 546-7000
FAX: (415) 546-7007
E-MAIL: kwalz@nhlp.org
*Pro Hac Vice*

/s/ Marcos Segura
Marcos Segura
Attorney for Plaintiffs
NATIONAL HOUSING LAW PROJECT
1663 Mission St., Suite 460

San Francisco, CA 94103
TEL: (415) 546-7000
FAX: (415) 546-7007
E-MAIL: msegura@nhlp.org
*Pro Hac Vice*

## TENANT PROTECTION ACTIONS

- Provide the local Servicing Office with a current list of all tenants showing their adjusted incomes.  The Servicing Office will:

    (a)      Notify tenants that the project is being prepaid;

    (b)      Send eligible tenants in the project *"Letters of Priority Entitlement  (LOPE)",* for priority placement in other Rural Housing Service projects.

- Extend all tenant leases for 180 days after the date the accelerated loan was paid off at the same rental rates and terms that were in effect on the day of the acceleration.  (If tenant is receiving RA, the tenants' share of the rent will be reflected on the lease.)

- Execute restrictive-use provisions, as appropriate, for incorporation into releases of security instruments to be filed.  (If the loan was made prior to December 21, 1979, no restrictive-use provisions will be included in the releases of security instruments, <u>unless</u> less than one year has elapsed since the date the borrower had submitted a request to prepay the loan(s) under the provisions of RD Instruction 3560)  (NOTE:  Any tenants or applicants for occupancy protected by these restrictions may not have total shelter costs (rent and utilities) raised above 30 percent of adjusted income or current shelter costs, whichever is higher.)  If the loan on this project to build or acquire new units was made on or after December 15, 1989, the restrictive-use provisions will remain for the term of the loan.

*Position 5*

USDA-FmHA
Form FmHA 427-1 NM
(Rev. 1-12-84)



## REAL ESTATE MORTGAGE FOR NEW MEXICO

THIS MORTGAGE is made and entered into by <u>LA VISTA DEL RIO APARTMENTS, A LIMITED</u>

<u>PARTNERSHIP</u>

residing in _____ <u>Santa Fe</u> _____ County, New Mexico whose post office address

is _____ <u>1911 Avenida Canada, Espanola</u> _____ , New Mexico <u>87523</u> ,
herein called "Borrower," and the United States of America, acting through the Farmers Home Administration, United States
Department of Agriculture, herein called the "Government":

WHEREAS Borrower is indebted to the Government as evidenced by one or more promissory note(s) or assumption
agreement(s), herein called "note," which has been executed by Borrower, is payable to the order of the Government, au-
thorizes acceleration of the entire indebtedness at the option of the Government upon any default by Borrower, and is
described as follows:

| *Date of Instrument* | *Principal Amount* | *Annual Rate of Interest* | *Due Date of Final Installment* |
|---|---|---|---|
| April 15, 1985 | $1,612,000.00 | **(b) (4)** | April 15, **(b) (4)** |

(The interest rate for limited resource farm ownership or limited resource operating loan(s) secured by this instrument
will be increased after 3 years, as provided in the Farmers Home Administration regulations and the note.)

And the note evidences a loan to Borrower, and the Government, at any time, may assign the note and insure the pay-
ment thereof pursuant to the Consolidated Farm and Rural Development Act, or Title V of the Housing Act of 1949, or any
other statute administered by the Farmers Home Administration;

And when payment of the note is insured by the Government, the Government may retain the right to a specified por-
tion of the payments on the note;

And a condition of the insurance of payment of the note will be that the holder will forego holder's rights and remedies
against Borrower and any others in connection with the loan evidenced thereby, as well as any benefit of this instrument, and
will accept the benefits of such insurance in lieu thereof, and upon the Government's request will assign the note to the
Government;

And it is the purpose and intent of this instrument that, among other things, at all times when the note is held by the
Government, or in the event the Government should assign this instrument without insurance of the note, this instrument
shall secure payment of the note; but when the note is held by an insured holder, this instrument shall not secure payment
of the note or attach to the debt evidenced thereby, but as to the note and such debt shall constitute an indemnity mortgage
to secure the Government against loss under its insurance contract by reason of any default by Borrower;

And this instrument also secures the recapture of any interest credit or subsidy which may be granted to the Borrower
by the Government pursuant to 42 U.S.C. §1490a.

NOW, THEREFORE, in consideration of the loan(s) and (a) at all times when the note is held by the Government, or
in the event the Government should assign this instrument without insurance of the payment of the note, to secure prompt
payment of the note and any renewals and extensions thereof and any agreements contained therein, including any provision
for the payment of an insurance or other charge, (b) at all times when the note is held by an insured holder, to secure per-
formance of Borrower's agreement herein to indemnify and save harmless the Government against loss under its insurance
contract by reason of any default by Borrower, and (c) in any event and at all times to secure the prompt payment of all
advances and expenditures made by the Government, with interest, as hereinafter described, and the performance of every
covenant and agreement of Borrower contained herein or in any supplementary agreement, Borrower does hereby grant,
convey, mortgage, and assign unto the Government the following property situated in the State of New Mexico, County(ies)

of _____ <u>Santa Fe</u> _____ :

FmHA 427-1 NM (Rev. 1-12-84)

Exhibit 2

**000115**

436627

Exhibit "A" attached hereto and incorporated herein.

Exhibit "B" attached hereto and incorporated herein.

together with all rights, interests, easements, hereditaments and appurtenances thereunto belonging, the rents, issues, and profits thereof and revenues and income therefrom, all improvements and personal property now or later attached thereto or reasonably necessary to the use thereof, including, but not limited to, ranges, refrigerators, clothes washers, clothes dryers, or carpeting purchased or financed in whole or in part with loan funds, all water, water rights, and water stock pertaining thereto, and all payments at any time owing to Borrower by virtue of any sale, lease, transfer, conveyance, or condemnation of any part thereof or interest therein-all of which are herein called "the property";

TO HAVE AND TO HOLD the property unto the Government and its assigns forever in fee simple.

BORROWER for Borrower's self, Borrower's heirs, executors, administrators, successors and assigns WARRANTS THE TITLE to the property to the Government against all lawful claims and demands whatsoever except any liens, encumbrances, easements, reservations, or conveyances specified hereinabove, and COVENANTS AND AGREES as follows:

(1)   To pay promptly when due any indebtedness to the Government hereby secured and to indemnify and save harmless the Government against any loss under its insurance of payment of the note by reason of any default by Borrower. At all times when the note is held by an insured holder, Borrower shall continue to make payments on the note to the Government. as collection agent for the holder.

(2)   To pay to the Government such fees and other charges as may now or hereafter be required by regulations of the Farmers Home Administration.

(3)   If required by the Government, to make additional monthly payments of 1/12 of the estimated annual taxes, assessments, insurance premiums and other charges upon the mortgaged premises.

(4)   Whether or not the note is insured by the Government, the Government may at any time pay any other amounts including advances for payment of prior and/or junior liens, required herein to be paid by Borrower and not paid by Borrower when due, as well as any costs and expenses for the preservation, protection, or enforcement of this lien, as advances for Borrower's account. All such advances shall bear interest at the rate borne by the note which has the highest interest rate.

(5)   All advances by the Government, including advances for payment of prior and/or junior liens, in addition to any advances required by the terms of the note, as described by this instrument, with interest shall be immediately due and payable by Borrower to the Government without demand at the place designated in the latest note and shall be secured hereby. No such advance by the Government shall relieve Borrower from breach of Borrower's covenant to pay. Any payment made by Borrower may be applied on the note or any indebtedness to the Government secured hereby, in any order the Government determines.

(6)   To use the loan evidenced by the note solely for purposes authorized by the Government.

000116

(7)   To pay when due all taxes, liens, judgments, encumbrances, and assessments lawfully attaching to or assessed against the property, including all charges and assessments in connection with water, water rights, and water stock pertaining to or reasonably necessary to the use of the real property described above, and promptly deliver to the Government without demand receipts evidencing such payments.

(8)   To keep the property insured as required by and under insurance policies approved by the Government and, at its request, to deliver such policies to the Government.

(9)   To maintain improvements in good repair and make repairs required by the Government; operate the property in a good and husbandmanlike manner; comply with such farm conservation practices and farm and home management plans as the Government from time to time may prescribe; and not to abandon the property, or cause or permit waste, lessening or impairment of the security covered hereby, or without the written consent of the Government, cut, remove, or lease any timber, gravel, oil, gas, coal, or other minerals except as may be necessary for ordinary domestic purposes.

(10)   To comply with all laws, ordinances, and regulations affecting the property.

(11)   To pay or reimburse the Government for expenses reasonably necessary or incidental to the protection of the lien and priority hereof and to the enforcement of or the compliance with the provisions hereof and of the note and any supplementary agreement (whether before or after default) including but not limited to costs of evidence of title to and survey of the property, costs of recording this and other instruments, attorneys' fees, trustees' fees, court costs, and expenses of advertising, selling, and conveying the property.

(12)   Neither the property nor any portion thereof or interest therein shall be leased, assigned, sold, transferred, or encumbered, voluntarily or otherwise, without the written consent of the Government. The Government shall have the sole and exclusive rights as mortgagee hereunder, including but not limited to the power to grant consents, partial releases, subordinations, and satisfaction, and no insured holder shall have any right, title or interest in or to the lien or any benefits hereof.

(13)   At all reasonable times the Government and its agents may inspect the property to ascertain whether the covenants and agreements contained herein or in any supplementary agreement are being performed.

(14)   The Government may (a) extend or defer the maturity of, and renew and reschedule the payments on, the debt evidenced by the note or any indebtedness to the Government secured by this instrument, (b) release any party who is liable under the note or for the debt from liability to the Government, (c) release portions of the property and subordinate its lien, and (d) waive any other of its rights under this instrument. Any and all this can and will be done without affecting the lien or the priority of this instrument or Borrower's or any other party's liability to the Government for payment of the note or debt secured by this instrument unless the Government says otherwise in writing. HOWEVER, any forbearance by the Government–whether once or often–in exercising any right or remedy under this instrument, or otherwise afforded by applicable law, shall not be a waiver of or preclude the exercise of any such right or remedy.

(15)   If at any time it shall appear to the Government that Borrower may be able to obtain a loan from a production credit association, a Federal land bank, or other responsible cooperative or private credit source, at reasonable rates and terms for loans for similar purposes and periods of time, Borrower will, upon the Government's request, apply for and accept such loan in sufficient amount to pay the note and any indebtedness secured hereby and to pay for any stock necessay to be purchased in a cooperative lending agency in connection with such loan.

(16)   Default hereunder shall constitute default under any other real estate, or under any personal property or other security instrument held or insured by the Government and executed or assumed by Borrower, and default under any such other security instrument shall constitute default hereunder.

(17)   SHOULD DEFAULT occur in the performance or discharge of any obligation in this instrument or secured by this instrument, or should the parties named as Borrower die or be declared incompetent, or should any one of the parties named as Borrower be declared a bankrupt or an insolvent, or make an assignment for the benefit of creditors, the Government, at its option, with or without notice, may: (a) declare the entire amount unpaid under the note and any indebtedness to the Government hereby secured immediately due and payable, (b) for the account of Borrower incur and pay reasonable expenses for repair or maintenance of and take possession of, operate or rent the property, (c) upon application by it and production of this instrument, without other evidence and without notice of hearing of said application, have a receiver appointed for the property, with the usual powers of receivers in like cases, (d) foreclose this instrument as provided herein or by law, and (e) enforce any and all other rights and remedies provided herein or by present or future law.

(18)   The proceeds of foreclosure sale shall be applied in the following order to the payment of: (a) costs and expenses incident to enforcing or complying with the provisions hereof, (b) any prior liens required by law or a competent court to be so paid, (c) the debt evidenced by the note and all indebtedness to the Government secured hereby, (d) inferior liens of record required by law or a competent court to be so paid, (e) at the Government's option, any other indebtedness of Borrower owing to or insured by the Government, and (f) any balance to Borrower. At foreclosure or other sale of all or any part of the property the Government and its agents may bid and purchase as a stranger and may pay the Government's share of the purchase price by crediting such amount on any debts of Borrower owing to or insured by the Government, in the order prescribed above.

(19)   Borrower agrees that the Government will not be bound by any present or future laws, (a) providing for valuation or appraisal of the property, (b) prohibiting maintenance of an action for a deficiency judgment or limiting the amount thereof or the time within which such action must be brought, (c) prescribing any other statute of limitations, or (d) limiting the conditions which the Government may by regulation impose, including the interest rate it may charge, as a condition of approving a transfer of the property to a new Borrower. Borrower expressly waives the benefit of any such State laws.

(20)   As against the debt evidenced by the note and any indebtedness to the Government hereby secured, with respect to the property, Borrower (a) hereby relinquishes, waives, and conveys all rights, inchoate or consummate, of valuation or appraisal to which Borrower is or becomes entitled under the laws and constitution of the jurisdiction where the property lies, and (b) hereby agrees that the period in which such property may be redeemed shall be limited to one month from the date of sale.

426829

(21) If any part of the loan for which this instrument is given shall be used to finance the purchase, construction or repair of property to be used as an owner-occupied dwelling (herein called "the dwelling") and if Borrower intends to sell or rent the dwelling and has obtained the Government's consent to do so (a) neither Borrower nor anyone authorized to act for Borrower will, after receipt of a bona fide offer, refuse to negotiate for the sale or rental of the dwelling or will otherwise make unavailable or deny the dwelling to anyone because of race, color, religion, sex or national origin, and (b) Borrower recognizes as illegal and hereby disclaims, and will not comply with or attempt to enforce any restrictive covenants on the dwelling relating to race, color, religion, sex, or national origin.

(22) This instrument shall be subject to the present regulations of the Farmers Home Administration, and to its future regulations not inconsistent with the express provisions hereof.

(23) Notices given hereunder shall be sent by certified mail, unless otherwise required by law, and addressed, unless and until some other address is designated in a notice so given, in the case of the Government to Farmers Home Administration at Albuquerque, New Mexico 87101, and in the case of Borrower to the address shown in the Farmers Home Administration Finance Office records (which normally will be the same as the post office address shown above).

(24) If any provision of this instrument or application thereof to any person or circumstances is held invalid, such invalidity will not affect other provisions or applications of the instrument which can be given effect without the invalid provision or application, and to that end the provisions hereof are declared to be severable.

IN WITNESS WHEREOF, Borrower has hereunto set Borrower's hand(s) and seal(s) this _____ 15th _____ day of _____ April _____, 19 85.

La Vista Del Rio Apartments, a New Mexico Limited Partnership by its General Partner, A&M Partnership, a Wyoming General Partnership

BY **(b) (6)**

Marvin Turner, General Partner of A & M Partnership

BY **(b) (6)**

Alton Coulter, General Partner of A & M Partnership

ACKNOWLEDGMENT

STATE OF NEW MEXICO }
COUNTY OF Santa Fe } ss

The foregoing instrument was acknowledged before me this _____ 15th _____ day of _____ April _____, 19 85, by Marvin Turner and Alton Coulter, General Partners of A & M Partnership, a Wyoming General Partnership

My commission expires : _____ 8-26-87 _____ **(b) (6)** Notary Public.

(SEAL)

000118

EXHIBIT "A"

423030

Lots 33 through 45, La Vista Del Rio Subdivision,
Espanola, New Mexico as shown on plat filed in
the Office of the County Clerk, Santa Fe County,
New Mexico on October 1, 1982 in Plat Book 120,
page 023 as Document No. 503,463: also described
by metes and bounds as follows:

Beginning at a point which bears S. 68° 21' 34"
W., a distance of 1163.15 feet; thence S. 9° 27'
24" E., a distance of 295.00 feet; thence S. 7°
02' 35" E., a distance of 265.24 feet; thence N.
80° 32' 36" E., a distance of 551.17 feet from
the NE corner of Sec. 1, T20N, R8E, N.M.P.M.;
thence bearing N. 9° 27' 24" W., a distance of
120.00 feet to a point; thence bearing N. 80°
32' 36" E., a distance of 300.00 feet to a point;
thence bearing S. 85° 21' 01" E., a distance of
87.62 feet to a point; thence bearing S. 77° 42'
24" E., a distance of 45.50 feet to a point;
thence bearing S. 37° 53' 55" W., a distance of
231.44 feet to a point; thence bearing S. 80°
32' 36" W., a distance of 58.70 feet to a point;
thence along a curve to the left having a radius
of 50.00 feet, an arc length of 104.72 feet
(ch = N. 39° 27' 24" W., 86.60) to a point;
thence bearing S. 80° 32' 36" W., a distance
of 155.00 feet to the point of beginning, con-
taining 53,016.317 square feet, more or less.

and,

Beginning at a point which bears S. 68° 21' 34"
W., a distance of 1163.15 feet; thence S. 9°
27' 24" E., a distance of 295.00 feet; thence
S. 7° 02' 35" E., a distance of 315.28 feet
from the NE corner of Sec. 1, T20N, R8E, N.M.P.M.,
said point being on the Easterly right-of-way
line of El Llano Road; thence bearing N. 80° 32'
36" E., a distance of 144.96 feet to a point;
thence along a curve to the left having a radius
of 50.00 feet, an arc length of 104.72 feet (ch
= N. 80° 32' 36" E., 86.60) to a point; thence
bearing N. 80° 32' 36" E., a distance of 426.70
feet to a point; thence along a curve to the
right having a radius of 25.00 feet, an arc
length of 39.27 feet (ch = S. 54° 27' 24" E.,
35.36) to a point; thence bearing S. 9° 27' 24"
E., a distance of 73.00 feet to a point; thence
along a curve to the left having a radius of
113.795 feet, an arc length of 12.02 feet (ch
= S. 12° 29' 00" E., 12.02) to a point; thence
bearing S. 80° 32' 36" W., a distance of 150.63
feet to a point; thence bearing S. 68° 43' 40"
W., a distance of 290.57 feet to a point; thence
bearing N. 87° 41' 56" W., a distance of 259.21
feet to a point, said point being on the Easterly
right-of-way line of El Llano Road; thence
bearing N. 7° 02' 35" W., a distance of 116.78
feet along said right-of-way line to the point
of beginning, containing 90,603.510 square feet,
more or less.

565,144

i hereby certify that this instrument was filed for
record on the 15th day of April A.D.,
1985 at 4:34 o'clock p.m.,
and was duly recorded in book 420

_____TY OF SANTA FE  )SS

Witness my Hand and Seal of Office
ANGIE VIGIL PEREZ
County Clerk, Santa Fe County, N.



Deputy

000119

| From: | John Bosley |
|---|---|
| To: | Haylett, Miriam - RD, ID |
| Subject: | [External Email]FW: Ownership of the Vista Del Rio Apartments |
| Date: | Thursday, March 23, 2023 3:46:21 PM |
| Attachments: | ~WRD0000.jpg |
| | scan_03-23-2023_133744_0001.pdf |

---

**[External Email]**
If this message comes from an **unexpected sender** or references a **vague/unexpected topic;**
Use caution before clicking links or opening attachments.
Please send any concerns or suspicious messages to: Spam.Abuse@usda.gov

---

**From:** John Bosley <jabosley@bosleymanagement.com>
**Sent:** Thursday, March 23, 2023 1:42 PM
**To:** 'Cristian Madrid' <cristian@espanolapathwaysshelter.org>
**Subject:** RE: Ownership of the Vista Del Rio Apartments

Hello Mr. Madrid,

I assume you have seen the property in the past since you are located in Espanola.  The 6 buildings consist of 3 one bedroom handicap units, 14 regular one bedroom units, 24 two bedroom units, and 8 three bedroom units.  Total square footage of all 6 buildings is 40,336 sq ft for 49 apartment units.  Current rents are one bdrm $679, two bdrm $795, and three bdrm $1,000.  These rents do not include individual unit monthly electric service bills which each tenant is responsible for.  The central building also includes an office and laundry room.

USDA has indicated they plan to sell the property out of the 515 Loan Program.  The asking price to satisfy the remaining loan balance to USDA would be $500,000.00.  The government would participate in a closing at a title company of your choosing, in which they would receive the funds in the form of a cashier's check presented to the closing agent, and La Vista Del Rio Apartments, a Limited Partnership, the current owner represented by me, would sell the property and convey title to the buyer.  The completion of the sale is contingent upon an "as is" status of the physical conditions of the buildings and grounds.  USDA has a condition of the sale requiring the current Leases to be extended for 180 days, during which time the tenant's rent amount must remain unchanged.  After the 180 day period, or upon the move out of an existing tenant, the new buyer has fulfilled the requirement and can replace all existing Leases and rents.  Our current status is 34 units rented and 15 vacant.  All vacant units would not be subject to the 180 day requirement.

I have attached a reduced layout of the property in the case you might need it.  I welcome your interest in the property and should you be interested enough to make a written offer, noting the inclusion of the USDA above requirements, I would be pleased to forward it to USDA.  Time is of the essence as always, and I would like to see the property's new ownership be one in which the project continues to address the need for low-income housing in Espanola.

Looking forward to your response.  Thank you.

*John A. Bosley*

Bosley Management, Inc.

Exhibit 3

Bosley Management of AZ, Inc.
WHG Partnership
566 Turner Lane, Sheridan, WY 82801
Ph (307) 672-9700   Fx. 672-9294
This institution is an equal opportunity provider and employer.

---

**From:** Cristian Madrid <cristian@espanolapathwaysshelter.org>
**Sent:** Thursday, March 23, 2023 8:32 AM
**To:** jabosley@bosleymanagement.com
**Cc:** Mateo Peixinho <mateo@avanyullc.com>
**Subject:** Ownership of the Vista Del Rio Apartments

Hello Mr. Bosley, my name is Cristian Madrid-Estrada and I am the CEO of the Española Pathways Shelter. Could you please provide me with the pertinent information in terms of purchasing the aforementioned property? I work alongside Mateo and have included him in this email. Thank you

--
In Appreciation,

**Cristian Madrid-Estrada**
**CEO, Espanola Pathways Shelter**
**(505)423-1426**



www.EspanolaPathwaysShelter.org

---

 Virus-free.www.avast.com

Attachment 6-A

Property Categorization Worksheet
(Use additional sheets as needed)

Property Name: La Vista Del Rio
Address: 911 Avenida Canada
Espanola, NM  87532

Borrower Case No.: 36-025-804155795 01-0
Appropriate Classification C          Date of classification 09/02/2022

Factors and influences to consider when evaluating a property.  Use the sections below to comment on each factor or influence.

| 1. Ownership: |
|---|
| LaVista Del Rio Apartments, A New Mexico Limited Partnership |
| WHG Partnership, its General Partner |
| Constance Bosley **(b) (4)**, John A. Bosley **(b) (4)** Michael Ryan **(b) (4)** |
| Rocky Mountain Investment A Ltd, Limited Partner |
|  |

| 2.  Management: |
|---|
| Bosley Management |
| 566 Turner Lane |
| Sheridan, WY  82801 |
|  |
|  |

HB-3-3560
Attachment 6-A
Page 2 of 6

| 3. Health or Safety: |
|---|
| Missing fire extinguishers, Non-existant or non-illuminated Exit signs. Drug Paraphernalia in exterior areas, window sills and stairways.   Doors and windows are damaged. |
|  |
|  |
|  |

| 4.  Physical Standards/Obsolesce: |
|---|
| Town has a crime and drug problem that has led to the demise of the property. |
|  |
|  |
|  |
|  |

| 5:  Transition Events: |
|---|
| Inspection took place on September 8, 2022 by Eric Siebens and Becki Meyer Servicing letters were sent out after the inspection. |
|  |
|  |
|  |

000020

HB-3-3560
Attachment 6-A
Page 3 of 6

| 6.  Revitalization Cost vs. New Construction/Replacement Cost: |
|---|
| Costs are high due to vandalism.   The borrower fixes items and they are quickly destroyed by vandals.   Drug and crime issues  in this town make it a hard property to manage and make cash flow. |
| |
| |

| 7.  Market Demand/ Vacancy / Need: |
|---|
| The property is needed, but the borrower is unable to make it a safe place to live. |
| |
| |
| |
| |

| 8. Economic Viability: |
|---|
| The property does not appear to be economically viable due to the crime and vandalism in the community.    The borrower has been unable to make the property a safe place to live. |
| |
| |

(02-24-05)  SPECIAL PN
Added (06-04-18) PN 513

000021

HB-3-3560
Attachment 6-A
Page 4 of 6

| 9. Environmental Influences: |
|---|
| Drug residues, Drug usage, Drug and crime issues in the community. |
| Inability for the community law enforcement to charge or lock up offenders. |
| |

| 10. Other (describe unique factors/influences affecting the property): |
|---|
| This property is located in a town with terrible crime and drug issues. |
| The property is continually vandalized causing a lot of cost to the property and making it economically nonviable for the owner. |
| Rural Development does not want to house people in properties that are not safe for the occupants. |

000022

| Conclusion: |
| --- |
| This property should exit the program.   The account should be accelerated and the tenants be given LOPE letters or vouchers. |
| |
| |
| |
| |
| |
| |
| |
| |
| |
| |
| |
| |
| |

The property is categorized as:

X_____ Category 1 – needed, but too expensive to preserve.

_____ Category 2 – needed and preserve-able.

_____ Category 3 – not need or revitalization is not financially feasible.

By: Miriam Haylett_____   Date: 1/19/2023_____
          (Servicing or State Official)

(02-24-05)  SPECIAL PN
Added (06-04-18) PN 513

**000023**

Servicing Strategy (describe servicing strategy):

Servicing Letters have been sent

Contact OGC and accelerate the loan.

This assessment should be reviewed periodically as market, ownership and property conditions change frequently.

Reviewed _____ (date & initial)  Changes noted: _____

Reviewed _____ (date & initial)  Changes noted: _____

Reviewed _____ (date & initial)  Changes noted: _____

**000024**

**USDA**

**United States Department of Agriculture**

Rural Development

September 15, 2022

Multifamily Housing
Field Operations Division
West – Troubled Assets

Rural Housing Service
2208 E. Chicago, Suite C
Caldwell, Idaho 83605
(208)779-3437
Miriam.Haylett@usda.gov

John A. Bosley
WHG Partner, General Partner
La Vista Del Rio Apartments, LP
Bosley Management of AZ, Inc.
566 Turner Lane
Sheridan, WY 82801

ROUTINE NOTICE OF SERVICING RESULTS/CONCERNS

RE: La Vista Del Rio Apartments – Espanola, New Mexico

Dear Mr. Bosley:

We are writing to inform you of the results of a recent review of certain selected aspects of your operations.   During an inspection on September 8, 2022, several Health and Safety violations were noted.   The following are issues of great concern at the property:

Maintenance, Health and Safety issues including:
▪ Missing Fire Extinguishers
▪ Non-illuminated exit signs.
● Drug Paraphernalia in the common areas and hallways..
● Fences and Retaining Walls - Damaged Dumpster Fence.
● Debris and Graffiti – Garbage around the dumpster and in and around the apartment building including drug paraphernalia and needles.   Graffiti inside and out of the apartment building.
● Swamp coolers are leaking and damaging the exterior of the building. The swamp coolers are rusted and past their useful life.  Some of them also had exposed wiring.
● Doors – Damaged doors.   Exterior doors do not close properly.    Interior apartment doors are damaged, don't close properly and/or have graffiti.
● Maintenance – overall the maintenance at the property does not meet USDA, Rural Development standards for decent, safe and sanitary housing.
● Flooring – Flooring in the common areas is damaged and stained.
● Stairways – Graffiti and dirty stairways
● Walls – Walls are damaged, dirty, and have graffiti on them.
● Landscaping and Grounds – The area around the apartment complex has garbage, and weeds.   The dumpster enclosure needs to be repaired.
● Electrical outlets in the common areas are missing covers.

You are in violation of the following USDA, Rural Development regulations and agreements:

USDA is an equal opportunity provider, employer, and lender.

**000173**

Page 1 of 2

Exhibit 5

*7 CFR 3560, 3560.103 Maintaining Housing Projects. (a) Physical Maintenance (1) The purpose of physical maintenance are the following: (i) Provide decent, safe, and sanitary housing an; and (ii) maintain the security of the property.*     You are not providing decent, safe or sanitary housing or properly maintaining the loan security.

*7 CFR 3560, 3560.103 (a)(2) Borrowers are responsible for the long-term, cost-effective preservation of the housing project.*     The housing is not being preserved.

*7 CFR 3560, 3560.103 (a)(3) At all times, borrower must maintain housing projects in compliance with local, state and federal laws and regulations and according to the ...Agency requirements for affordable, decent, safe, and sanitary housing.*     You have not stayed in compliance with local, state or federal laws or the Agency requirements for decent, safe and sanitary housing.

*7 CFR 3560, 3560.103 Housing Maintenance Standards* – Maintenance Standards for Rural Development properties are not being met.

*Loan Agreement Section 6, Regulatory Covenants – "So long as the loan obligations remain unsatisfied, the partnership shall comply with all appropriate FmHA regulations"*   By not providing decent, safe and sanitary housing, you are not complying with your loan agreement.

*Management Certification 3, "We agree to a. comply with the projects mortgage and promissory note, and Loan Agreement/Resolution" b. Comply with Rural Development Handbooks and other policy directives that relate to the Management of the project".*   By not providing decent, safe and sanitary housing, you are not meeting the requirements of the Management Certification.

We are asking that you contact this office within 15 days of the date of this letter to inform us of the corrective actions you have taken, or plan to take, to correct the concerns listed.   All health, safety and maintenance violations must be addressed and resolved.   Our office address and telephone number are: 2208 E. Chicago, Suite C, Caldwell, Idaho 83605, 208-779-3437.

If you have any questions, please contact me at 208-779-3437.

Sincerely,

*Miriam Haylett*

Miriam Haylett
Multi-Family Specialist
West Troubled Assets Servicing Team
Field Operations Division

Enclosure:   Failed City of Espanola Fire Inspection Report.

**000174**

**SPECIAL SERVICING WORK OUT PLAN**
**LA VISTA DEL RIO APARTMENTS, ESPANOLA, NM.**

Drafted - 09/26/2022                                        Revised - //

The Borrower is committed to working with Rural Development to cure the immediate financial obligations, long term vacancy rate and safety conditions at the project.

**A. Background Information.**
**History:**   The project was constructed with a Rural Development (RD) loan made in 1984, and placed in service that year.  The project has over the years asked for and been granted rent increases based on budget projections for predictable allowable expenses.  The Owner has requested the maximum reasonable rent increase each and every year to make the largest gain possible in operations cash flow. Some years in the past, the requested rental increase was decreased due to USDA rules and or actions. The property is in Santa Fe County, which, has in the past, had much higher allowable rents than other surrounding counties.  The County dividing line is between this location and the Santa Clara Apartments also managed by the same Management Agent.  As a feature of the 515 loan program, the build up of unrestricted cash is not permitted.  The project started out, and remains a Family occupancy project.

The reserve account has been used under RD regulations and oversight to assure all funds were approved for allowable and needed improvements.  The yearly transfer to reserve has not been increased in 38 years.  The market area has increased in population and with specifically low income families and persons.  We have seen Espanola conditions develop in the last few years in which drug usage and homeless people have increased at an alarming rate.  The town of Espanola was known as "The heroin capital of New Mexico", but the drugs of choice have now moved on to other more potent choices. Illegal drug activity takes place in and around the property each and every day.

| Current rents are as follows: | Basic | Note |
|---|---|---|
| One Bedroom | $577 | $760 |
| Two Bedroom | $693 | $885 |
| Three Bedroom | $898 | $1070 |

Current occupancy rate is 39 out of 48 income producing units, or 81%.  And of the 9 vacant units, only 1 is ready to rent.  We have 8 vacant units in various stages of damage caused by previous tenants, or more frequently by homeless persons trespassing in the building and destroying entry doors to get into and use bathrooms and use illegal drugs.  We are working on 5 units at this time that will be ready to rent once the new flooring has been installed.  We definitely have had material source and labor delays over the past year due to COVID circumstances.

**B. Scope of the Problem.**
1. Compliance Concerns.
The project's 504 Self Evaluation and Needs Assessment Transition plan, or SENAT Plan, has just been received and is being evaluated for feasibility and financing sources.  Priced at $77,732 with an accuracy disclaimer covering the proposed improvements costs, the project will have a difficult task to rehab damaged units and address the 504 requirements.  Poor occupancy has been the main cause of the cash flow shortages, which has been caused by a shortage of reliable maintenance staff and obtaining materials in a timely manner.  It is the Owner's goal to achieve full placement of 48 Rental Assistance units at the earliest date possible, and to maintain that level on a monthly basis.

A funding source to make full repairs to all vacant units does exist in the reserve account. The vacancy rate eliminates eligibility for MPR loan funds. The Owner does not know if MPR debt deferral qualifications could be met, or if such funds can even be used to improve the project over time.

2. Financial Concerns.
The project has a poor curb appeal, and has been ineligible for MPR Loan funds under the past loan eligibility requirements for occupancy. Additional loan funds from the Limited Partnership are not available.

Status of Accounts as of:
9/26/2022: O&M is (b) (6) ., Reserve is (b) (6) ., Security is (b) (6) , and T&I is (b) (6).

The cash flow is barely sufficient to fund the monthly payables and the T&I and reserve accounts on a monthly basis. The reserve has been historically used for numerous hallway flooring replacements, excessive plumbing repairs, exterior doors and door jambs, air conditioning units, and exterior painting,. In the past three years, the reserve account has been used to pay some vacant unit damages and turnover expenses. In 2023 reserve funds may be needed to pay the property taxes.

3. Deferred Maintenance.
All deferred maintenance items the Agent has identified are issues caused by a lack of a large funding source, inadequate maintenance staff and or contractors. Improving the projects physical condition has not been arbitrarily deferred by choice. At present, larger maintenance items are deferred due to insufficient assets. Repairs will first be made to vacant units that have a reasonable cost required to get them to a rentable status. Source of funds for these capital improvements will be from excess buildup of operations funds in the O&M Account derived from the proposed rent increase, and the current Reserve Account balance to the current extent of the account balance. The search for affordable contractors is hampered by the fact there are literally no contractors in Espanola. Santa Fe is the closest major source of tradesmen, however our efforts to obtain bids, or even site inspections has been zero.

4. Safety and Security Compliance.
In response the Routine Notice of Servicing Results/Concerns letter we received, we have the following plans, actions or comments.

Missing Fire Extinguishers: All missing extinguishers are either removed to prevent theft, or have already been stolen. We will obtain a cost from our Security Vendor and request reserve funds to replace all missing extinguishers. We will make every effort in the future to replace stolen items on a more frequent basis.

Non-illuminated Exit Signs. This issue is noted on the Fire Department's Inspection report as "exit signs and emergency lighting present and operable. Some have exit signs that were not working".
Contrary to the Fire Departments latest inspection, we don't have any exit signs in the common stairwell areas. We will have our Security Vendor, Relion Security inspect the emergency lights and a cost will be established and reserve fund will be requested for any repairs needed.

Drug Paraphernalia in Common Areas. We will increase our clean up efforts in an attempt to keep up with the drug users. Drug usage, sales, and all the side effects of these illegal drugs is out of control in Espanola, NM.

Damaged Fencing. We will repair our boundary fencing once again. We have fixed it twice this year and it has now been cut open again. If the homeless people that have invaded the city of Espanola were

000162

not camped out on the other side of our fence, there would not be holes cut into the fence. The fences have been in place for 38 years. Our troubles started in 2019 and getting worse every day.

Debris and Graffiti. We will make a better monthly effort to keep up with the local gangs and paint out the graffiti. Trash has become an every day problem, and more staff is needed to increase clean up tours.

Swamp Coolers. We attempted to start replacements on the swamp coolers in our 2020 budget, however being able to purchase them is not a problem, whereas getting them installed is. Our efforts to locate a contractor were not rewarded in 2020 or 2021. This is a high dollar item as the cost for the 48 coolers is **(b)(4)** and installation would most likely be **(b)(4)** We would need a funding source prior to starting replacements.

Damaged Doors. Replacement of the 12 main building entry doors has been bid in the past at **(b) (4)** The problem driving the price up is that the last time the doors were replaced 6 years ago, a extra heavy door and frame system was used and the company that produced that product has ceased to exist. The design was unusual and labor to replace them is higher than the usual cost.

Maintenance. Our ability to hire competent maintenance staff persons is limited. Persons with any knowledge of construction or work ethic are few and far between in the immediate area. We have tried seven employees in 2021 and 2022 and have never stopped looking for somebody of higher ability.

Stairwell Flooring. We will obtain replacement bids for all hallways and request replacement funds from Reserve. We would prefer to invest the funds for this item after some kind of limited access to the buildings is developed with our Security Vendor and put in place. At this time, we are not aware of exactly how that would work and retain open and free fire exits from the building entries.

Interior Graffiti. We can and will repaint all interior stairwell walls once it is established that there is limited access to non-tenants and homeless individuals who have damaged our property.

Landscaping and Grounds. The property was constructed with desert style landscaping due to the excessive cost of water in Espanola. Our costs have become unsustainable for water and sewer over the last 3-4 years with costs increasing every year.

Electrical Outlets. All common area outlets will be inspected this week, September 26th to 30th and repaired.

## C. Underlying Causes.

The underlying cause of the present conditions and problems was, and are quite frankly, the soft on crime stature of the Espanola police and court system. I don't blame the Police because nothing happens once they come to the property and remove trespassers. It is up to the prosecutors to take it forward, and that just doesn't happen. The homeless individuals who invade our property and shoot up their drugs already know there is no penalty for breaking into our building, or destroying our property. The Police will remove them upon our request, however the people are just let go immediately and have even showed back up at the project within the same day. Our employees are not law enforcement officers, and therefore cannot take any actions against these people under any circumstances. I manage properties in Montana, Wyoming, Colorado, New Mexico, and Arizona, and have done so under RD regulations for the past 32 years. NOWHERE else, at 40 other locations or towns, is there this lax enforcement of property rights.

## D. Recovery Plan Outline.

1. Marketing. Since occupancy remains an issue, the Agent will market locally to increase occupancy levels. We have sufficient numbers of applicants to fill all the vacant units. We have been unable to maintain a maintenance schedule in 2022 to keep units rented. We are working towards improvements in the time it takes to turn around units, however the level of damage in vacant units at this property is the highest we have to deal with.

2. Upgrading Project Desirability

    a. Maintenance spending for 2023 has been set at a level consistent with projections based on prior years expenses and the projected available funds from the planned rent structure.

    b. Curb appeal continues to be poor. Future improvements we could be making would be new exterior paint, all new swamp coolers, security fencing and working exterior doors that featured limited or controlled access to only tenants.

    c. The agent is fully aware of many security issues at the project. In this plan, we will propose to spend funds for items we and RD feel will make a difference in security. Camera System, Part time Security Guard who will call local law enforcement to address witnessed crimes, and to make every attempt to keep homeless persons and drug usage off the property.

    d. Communication with other agencies or the tenants is a problem. My Site Manager is the only person I currently know of who is tough enough to function in this job. She is not popular with local officials because she expects them to do their jobs and it isn't happening. She is not bashful with regards to comments when they fail.

3. Reducing Expenditures.

    a. Management Fees for 2023 will be budgeted at **(b)(4)**. The normal maximum fee would be **(b)(4)** with full occupancy, and approximately **(b)(4)** based on recent occupancy levels. Site Management Staff wages have been increased due to New Mexico's mandated minimum wage requirements.

    b. The Owner's Return on Investment has been waived while under this Special Servicing Plan per the applicable regulations and will not be taken by the owner.

    c. Reserve Account Transfers will be retained under this plan at **(b)(4)** per year.

    d. Deferred Loan Payments are not a feature of this plan at this time.

4. Increasing Revenues

    a. Non-project revenues are not available at this time as additional ownership reinvestment capital does not exist. Additional capital investment from the Partners in the Limited Partnership is limited by the Agreement to the initial investment of each Partner.

    b. A rent increase is proposed in the 9/01/2023 fiscal budget. (See Attached).

    c. Rent Incentives are not considered viable, as the regulations would require the Borrower to provide additional capital funding to offset the cost of incentives, for which no funding source exists.

## E. Implementation of Servicing Plan.

1. Maintenance Goals will be kept current per the current budget funding levels per the approved 2023 project budget.

2. Use of Supervised Account. The Reserve Account will continue to be maintained per USDA RD regulations.

3. Time frame. The plan is proposed to extend to the end of October , 2023.

**000164**

4. Agency Plan Review. The management agent is responsible for making timely progress reports with regard to plan compliance to Rural Development and the Borrower. The first report will be due no later than 100 days from the date of Rural Development's approval and every 100 days thereafter. Evidence of deposits to the Reserve Account will be provided monthly.

## F. Anticipated Results.

1. Compliance Concerns. The continued funding to the reserve account will allow for payments on time for expenses and increases to the O&M account will provide additional funds to address some unit deferred maintenance issues identified by RD inspection.

2. Financial Concerns. The plan maintains the use of Reserve and T&I accounts to meet the regular obligations of each account. The Borrower expects this problem to decrease in scope and severity once the income is increased to support the project operations and costs of maintaining the project.

3. Deferred Maintenance. Provided our security guard is hired and starts to make a difference, our staff can shift their attention from damage control to refurbishing vacant units and addressing tenant maintenance requests in a timely manner.

4. Vacancy Rate. The goal of reducing the vacancy rate from approximately ▮▮▮ for FY 2022 to the lower level of ▮▮▮ in 2023, and eventually to the acceptable level of approximately ▮▮▮ or less. This may be achieved if our efforts to attract applicants that need Rental Assistance, or applicants with higher incomes are successful. Note: The property currently has ▮▮ units of Rental Assistance for 48 revenue producing units.

## G. Work Out Plan Completion.

1. It is anticipated that our security improvements as outlined will improve our ability to deter homeless drug addicts from attempting to enter our property illegally.

2. At the end of one year, there will be a reevaluation of the plan to ensure the goal of increasing the reserve deposits and improving deferred maintenance has been met.

3. The Work Out Plan is expected to be implemented by 11/01/2022, and be completed and ended at the close of October 2023.

**000165**

This Special Servicing Plan for the La Vista Del Rio Apartments, a Limited Partnership is enacted as revised on 10/01/2022. The plan will be subject to review by RD Staff and the Management Agent at regular intervals.

**MANAGEMENT AGENT:**
~~Bosley Management Inc.~~

**(b) (6)** ------------

~~John A. Bosley, President~~

**BORROWER:**
La Vista Del Rio Apartments, a Limited Partnership

**(b) (6)** --------

John A. Bosley, Partner of WHG
Partnership, the General Partner

**RURAL DEVELOPMENT, USDA**

------------------------------------------------------------

------------------------------------------------------------
                        **Title**

**000166**

**USDA**

**United States Department of Agriculture**

Rural Development                                                                                     January 17, 2023

Multifamily Housing
Field Operations Division
West – Troubled Assets

Rural Housing Service
2208 E. Chicago, Suite C
Caldwell, Idaho 83605
(208)779-3437
Miriam.Haylett@usda.gov

John A. Bosley
WHG Partner, General Partner
La Vista Del Rio Apartments, LP
Bosley Management of AZ, Inc.
566 Turner Lane
Sheridan, WY 82801

NOTIFICATION OF INTENT TO PURSUE MORE FORCEFUL SERVICING
ACTIONS – REVISED Servicing Letter #3

RE: La Vista Del Rio Apartments – Espanola, New Mexico

Dear Mr. Bosley:

We regret that earlier attempts to resolve issues at the La Vista Del Rio Apartments have
not been successful.   We are writing to inform you that Rural Development intends to
take further action unless alternative arrangements are promptly made with this Agency.
If you have not contacted us within 15 days with a solution, we intend to forward a
problem case report to the Western Regional Director,  recommending that this case be
forwarded to the Office of General Council to pursue further action which could include
suing for specific performance and/or acceleration of your account.

During an inspection on September 8, 2022, several Health and Safety violations were
noted.  The following are issues of great concern at the property:

On September 26, 2022 we received a proposed workout plan.   The Workout plan
was revised on October 28, 2022.  This workout plan was rejected on December 9,
2022.  Although the workout plan is very thorough, well written, and gives us
background as to why the property is in its current state, it does not provide a
timeline of when we can expect all the concerns listed in our first letter will be
resolved.  In addition to the deferred maintenance at the property, the health and
safety issues are a serious concern for our Agency.   The lack of funds to resolve
these issues at the property is stated as to why the property is in its current state and
why the issues cannot be resolved timely.   The Workout plan states that funds to
make full repairs do not exist.   As you are aware, the property is not currently
decent, safe, sanitary or sustainable as it is currently being run.   Unfortunately, due
to the current conditions at this property, any resolution must address all of the
issues to make the property safe and maintained for the residents.   This property
does not appear to be economically viable, without a substantial outside contribution,
considering all of the deferred maintenance and health, sanitary and safety issues
that this property poses.

The following are non-compliance issues at the property that need to be resolved.
Health and Safety issues should be resolved within 10 days:

Maintenance, Health and Safety issues including:
- ▪ Missing Fire Extinguishers
- ▪ Non-illuminated exit signs.
- Drug Paraphernalia in the exterior areas, window sills  and stairways.
- Fences and Retaining Walls - Damaged Dumpster Fence.
- Debris and Graffiti – Garbage around the dumpster and in and around the apartment building including drug paraphernalia and needles.   Graffiti inside and out of the apartment building.
- Swamp coolers are leaking and damaging the exterior of the building. The swamp coolers are rusted and past their useful life.  Some of them also had exposed wiring.
- Doors – Damaged doors.   Exterior doors do not close properly or are damaged. Interior apartment doors are damaged, don't close properly and/or have graffiti.
- Maintenance – overall the maintenance at the property does not meet USDA, Rural Development standards for decent, safe and sanitary housing.
- Flooring – Flooring in the common areas is damaged, filthy and stained.
- Stairways – Graffiti and dirty stairways
- Walls – Walls are damaged, dirty, and have graffiti on them.
- Landscaping and Grounds – The area around the apartment complex has garbage, and weeds.   The dumpster enclosure needs to be repaired.
- Electrical outlets in the common areas are missing covers.

You are in violation of the following USDA, Rural Development regulations and agreements:

*7 CFR 3560, 3560.103 Maintaining Housing Projects. (a) Physical Maintenance (1) The purpose of physical maintenance are the following: (i) Provide decent, safe, and sanitary housing an; and (ii) maintain the security of the property.*     You are not providing decent, safe or sanitary housing or properly maintaining the loan security.

*7 CFR 3560, 3560.103 (a)(2) Borrowers are responsible for the long-term, cost-effective preservation of the housing project.*     The housing is not being preserved.

*7 CFR 3560, 3560.103 (a)(3) At all times, borrower must maintain housing projects in compliance with local, state and federal laws and regulations and according to the …Agency requirements for affordable, decent, safe, and sanitary housing.*     You have not stayed in compliance with local, state or federal laws or the Agency requirements for decent, safe and sanitary housing.

*7 CFR 3560, 3560.103 Housing Maintenance Standards* – Maintenance Standards for Rural Development properties are not being met.

*Loan Agreement Section 6, Regulatory Covenants – "So long as the loan obligations remain unsatisfied, the partnership shall comply with all appropriate FmHA regulations"*     By not providing decent, safe and sanitary housing, you are not complying with your loan agreement.

*Management Certification 3, "We agree to a. comply with the projects mortgage and promissory note, and Loan Agreement/Resolution" b. Comply with Rural Development Handbooks and other policy directives that relate to the Management of the project".*    By not providing decent, safe and sanitary housing, you are not meeting the requirements of the Management Certification.

**000109**

We are hopeful we can avoid the necessity of taking the steps outlined above.   Unfortunately, we will be forced to do so unless we hear from you within 15 days from the date of this letter.

Our office address and telephone number are:    2208 E. Chicago, Suite C, Caldwell, Idaho 83605, 208-779-3437.   My email is Miriam.Haylett@USDA.GOV.

If you have any questions, please contact me at 208-779-3437.

Sincerely,

*Miriam Haylett*

Miriam Haylett
Multi-Family Specialist
West Troubled Assets Servicing Team
Field Operations Division

EC:    Becki Meyer, Regional Director, West Field Operations Division
        Robert Hawkes, Troubled Assets Team Lead, West Field Operations Division

**000110**

| From: | Haylett, Miriam - RD, ID |
|---|---|
| To: | "John Bosley" |
| Cc: | Meyer, Becki - RD, WA; Hawkes, Robert - RD, ID |
| Subject: | NM - Revised Servicing Letter - La Vista Del Rio Apartments, Espanola, NM |
| Date: | Tuesday, January 17, 2023 11:23:00 AM |
| Attachments: | SL3 - 011723 - La Vista Del Rio - Espanola NM - Revised.docx |
| | image001.jpg |
| | image002.png |
| | image003.png |
| | image004.png |
| | image005.png |
| | image006.png |
| | image007.jpg |

Mr. Bosley —

Attached is the revised Servicing Letter #3 which further clarifies the denial of the proposed Workout Plan.

In addition, the question below regarding the borrower contribution, it is the borrowers responsibility to keep the property well maintained and safe for the tenants.    The Workout Plan states that funds are not currently available to correct all deficiencies.    Funds could come from the borrower, or as an additional loan to the property, if it could viably sustain it.    However, as stated in the workout plan, the property is not eligible for an MPR, so a borrower contribution may be the only solution.    We can further discuss this issue at our meeting on Thursday.

Respectfully,

Miriam Haylett
Loan Specialist
West Troubled Assets Servicing Team
Field Operations Division
Multi-Family Housing, Rural Development
United States Department of Agriculture
2208 E. Chicago, Suite C, Caldwell, Idaho  83605
Phone: (208)779-3437 | FAX:  (855) 584-6125
http://www.rurdev.usda.gov/ID | "Together, America Prospers"

Sign up for notifications from Rural Development

*USDA is an equal opportunity provider, employer, and lender.*

Stay Connected with USDA:



USDA is an equal opportunity provider and employer.

**From:** John Bosley <jabosley@bosleymanagement.com>
**Sent:** Friday, January 13, 2023 10:37 AM

Exhibit 8

**To:** Haylett, Miriam - RD, ID <miriam.haylett@usda.gov>
**Subject:** [External Email]Santa Clara and La Vista Del Rio Apartments, Espanola, NM

[External Email]
If this message comes from an **unexpected sender** or references a **vague/unexpected topic;**
Use caution before clicking links or opening attachments.
Please send any concerns or suspicious messages to: Spam.Abuse@usda.gov

Ms. Haylett,

We have reviewed your January 6, 2023 letter advising the Borrower of your future servicing actions for the La Vista Del Rio Apartments, a Limited Partnership. In that letter, you note receiving a Work Out Plan on September 26, 2022, and later denying an approval of that plan. I am resending the email that has revised WOPs for both properties that are dated 10/28/22. Since your letter makes reference to the first WOP, we are questioning if the revised 10/28 WOP, as attached, was reviewed and also denied. If that is the case, could you please verify that decision.

Your 01/06/23 letter also states that "the property does not appear to be economically viable without a substantial borrower contribution." I don't find regulations that support the requirement of an additional borrower financial contribution to achieve economic viability. Please forward a reference to such a regulation that would apply to a limited partnership entity.

The Borrower would like to discuss these issues in a telephone conference with the Agency in the near future.

Thank you,

*John A. Bosley*

Bosley Management, Inc.
Bosley Management of AZ, Inc.
WHG Partnership
566 Turner Lane, Sheridan, WY 82801
Ph (307) 672-9700   Fx. 672-9294
This institution is an equal opportunity provider and employer.

Hello Ms. Haylett,

Please see the attached revised Work Out Plans and Proposed 2023 Project Budgets that reflect the changes and conditions of the attached WOPs.

The deadline associated with your last communication received on 10/20/22 has been met.

Thank you,

*John A. Bosley*

Bosley Management, Inc.

**000069**

Bosley Management of AZ, Inc.
WHG Partnership
566 Turner Lane, Sheridan, WY 82801
Ph (307) 672-9700   Fx. 672-9294
This institution is an equal opportunity provider and employer.

 Virus-free.www.avast.com

**000070**

| From: | Haylett, Miriam - RD, ID |
|---|---|
| To: | jabosley@bosleymanagement.com |
| Cc: | Hawkes, Robert - RD, ID; Meyer, Becki - RD, WA |
| Subject: | FW: NM - Acceleration Notice - La Vista Del Rio |
| Date: | Friday, March 17, 2023 6:10:00 PM |
| Attachments: | zLAVISTA DEL RIO LEGAL.pdf |
| | zTenant Protection Actions for acceleration.pdf |
| | image001.jpg |
| | image002.png |
| | image003.png |
| | image004.jpg |
| | image005.png |
| | image006.png |
| | image007.jpg |
| | NoticeOfAcceleration - La Vista Del Rio USPS Certified.pdf |
| | Last Remaining Tenant Restrictive Use Provision - La Vista Del Rio .pdf |

Mr. Bosley –

Attached is the acceleration notice for the La Vista Del Rio property.
Please read the Tenant Protective Actions for acceleration.
To avoid foreclosure, it will be necessary that you extend all leases for 6 months, sign the Restrictive Use provision, and pay the property in full.
If you are unable to fulfill the requirements of the acceleration notice, please reach out to our Agency.

Please call me if you have any questions, or wish to discuss this action further.   Your appeal rights are included in the acceleration notice.

Respectfully,

Miriam Haylett
Loan Specialist
West Troubled Assets Servicing Team
Field Operations Division
Multi-Family Housing, Rural Development
United States Department of Agriculture
2208 E. Chicago, Suite C, Caldwell, Idaho  83605
Phone: (208)779-3437 | FAX:  (855) 584-6125
http://www.rurdev.usda.gov/ID | "Together, America Prospers"

Sign up for notifications from Rural Development

*USDA is an equal opportunity provider, employer, and lender.*

Stay Connected with USDA:



USDA is an equal opportunity provider and employer.

Exhibit 9     **000044**



**AREA MARKET RENT STUDY (AMRS)**

**CONFIDENTIAL - INTERNAL USE ONLY BY USDA - RURAL DEVELOPMENT**

For use by the Rural Development Voucher Program, as authorized under Section 542 of the Housing Act of 1949, as amended.

| | |
|---|---|
| FILE # | **(b) (5)** |
| TO: USDA/RD Staff in: | New Mexico |
| Attention: | Miriam Haylett |
| Date of AMRS: | Nov 15, 2022 |
| Name of AMRS provider: | CHARLES KIMBER — Digitally signed by CHARLES KIMBER Date: 2022.11.15 12:01:51 -07'00' |
| City, State & Zip Code of AMRS: | Espanola, New Mexico 87532 |

Description of the research and geographic area of the AMRS: I started searching rentals in Espanola, and gradually expanded my search outward. Search engines for data kept pointing me to Santa Fe, and I resisted the rentals found there. Searches lead me to Los Alamos and Taos, where I found several rentals, however the best like one was the Ponderosa Pines and Casa De Luz Apartments.   Also included are Single Family Housing offerings. Below are the rental offerings found, and their rents and overall conclusions.   Overall I found very few of the listings had available units.  The vacancy rate appears to be really low in the area.

Add Bedroom Section

## DATA AND METHODOLOGY:

Bedrooms: 1

New Line

| # UNITS | RENT | TOTALS | APARTMENT NAME | ADDRESS |
|---|---|---|---|---|
| **(b) (5)** | $1,025.00 | **(b) (5)** | SFH | 9B SE Cerro Ventoso Rd., Taos, NM |
| | $1,150.00 | | SFH | 530 Dolan St. #B, Taos, NM |
| | $1,050.00 | | SFH - Mobile Home | 610 S Riverside Dr., Espanola, NM |
| | $1,200.00 | | Apartment Attached to SFH | Casita Ranchos de Taos, NM |
| | $1,125.00 | | Ponderosa Pines | 3000 Trinity Drive, Los Alamos, NM |
| | $865.00 | | Casa De Luz Apartments | 799 Sixth Street, Los Alamos, NM |
| | | | AMR 1 Bedroom(s): **(b) (5)** | |

Exhibit 10

**000043**

Bedrooms: 2

New Line

| # UNITS | RENT | TOTALS | APARTMENT NAME | ADDRESS |
|---------|------|--------|----------------|---------|
| (b) (5) | $1,200.00 | (b) (5) | Las Lomas | 600 New Mexico 76,  Espanola NM 87532 |
|  | $1,550.00 |  | SFH | 1012 Camino De La Serna, Taos, NM |
|  | $1,200.00 |  | SFH - Mobile Home | 436 County Road 59, Embudo, NM 87531 |
|  | $1,450.00 |  | SFH | 16 County Road 50, Embudo, NM 87531 |
|  | $1,350.00 |  | Ponderosa Pines Apts. | 3000 Trinity Dr., Los Alamos, NM |
|  |  |  |  |  |
|  |  |  | AMR 2 Bedroom(s) (b) (5) |  |

**000044**

| | |
|---|---|
| **From:** | Haylett, Miriam - RD, ID |
| **To:** | Hawkes, Robert - RD, ID; Meyer, Becki - RD, WA |
| **Subject:** | NM : Updated Bullet Points for La Vista Del Rio |
| **Date:** | Saturday, March 18, 2023 11:22:00 AM |
| **Attachments:** | image001.jpg |
| | image002.png |
| | image003.png |
| | image004.jpg |
| | image005.png |
| | image006.png |
| | image007.jpg |

Becki and Bob

Just an FYI – typically the tenants are not eligible for vouchers and LOPE letters until the borrower actually pays off and fulfills the tenant protection actions.    Mr. Bosley indicated to me that he does not plan on fulfilling the tenant protection actions.
We will need exception authority to officer vouchers and LOPE letters at this time.   (prior to payoff)


Respectfully,

Miriam Haylett
Loan Specialist
West Troubled Assets Servicing Team
Field Operations Division
Multi-Family Housing, Rural Development
United States Department of Agriculture
2208 E. Chicago, Suite C, Caldwell, Idaho  83605
Phone: (208)779-3437 | FAX:  (855) 584-6125
http://www.rurdev.usda.gov/ID | "Together, America Prospers"

Sign up for notifications from Rural Development

*USDA is an equal opportunity provider, employer, and lender.*

Stay Connected with USDA:



USDA is an equal opportunity provider and employer.


**From:** Hawkes, Robert - RD, ID <robert.hawkes@usda.gov>
**Sent:** Friday, March 17, 2023 7:29 PM
**To:** Meyer, Becki - RD, WA <becki.meyer@usda.gov>
**Cc:** Haylett, Miriam - RD, ID <miriam.haylett@usda.gov>
**Subject:** Updated Bullet Points for La Vista Del Rio

Becki,

Exhibit 11

Here are the updated bullet points for La Vista Del Rio:



If you have any questions, please let me know.  Thank you.

**Robert Hawkes**
Troubled Assets Team Lead
West Region
Field Operations Division
Multifamily Housing, Rural Development
United States Department of Agriculture
Phone (208) 944-3753  Fax (208) 734-0428
Cell **(b) (6)**
www.rd.usda.gov

**USDA**
**United States Department of Agriculture**



**¡Este documento es importante, tradúzcalo inmediatamente!**

Rural Development

Multi-Family Housing
Attn. USDA RD
Voucher Program

PO Box 775220
St. Louis, MO
63177

Voice 844 857 5386
Fax 844 677 2890

Email
rdvoucher@usda.gov

March 21, 2023

LARRY MONDRAGON
911 Avenida Canada
Unit 40
ESPANOLA, NM 87532

Tenant ID: 2017089

**Re:  RURAL DEVELOPMENT VOUCHER INFORMATION – ELIGIBILITY AND VOUCHER
AMOUNT DETERMINATION**

Dear LARRY MONDRAGON:

The purpose of this letter is to notify you that prepayment or foreclosure of your apartment complex occurred on 03/17/2023. This means that the USDA loan on the property no longer exists, and the rent for your unit <u>may</u> increase or you may wish to move.

This letter provides information about three types of future rent assistance that you may receive as a result of this action.  The first two do not require new funding by USDA, while the third requires that new funds be available for use.  Specifically the three types of assistance are:

- **Letter of Priority Entitlement (LOPE)** moves you to the top of the waiting list in another RD property;
- **Transfer of Rental Assistance (RA)** allows your rent payment to remain the same if you move to another RD property; or
- **Rural Development Voucher (RD Voucher)** provides 12 monthly subsidy payments at most rental units anywhere in the United States.

**Carefully read this entire letter for full information about your possible benefits and the actions required for you to receive these benefits.**

**LETTER OF PRIORITY ENTITLEMENT TO ANOTHER USDA UNIT**

A **Letter of Priority Entitlement or LOPE letter, moves you to the top of the waiting list in other Rural Development-financed properties**. You have up to one year from the date of the prepayment to request a LOPE letter. Using the LOPE letter can make it easier for you to obtain another USDA-financed unit where rents are lower than in the general market.

To obtain a list of Rural Development properties where the LOPE letter can be used, please visit the following website:  http://rdmfhrentals.sc.egov.usda.gov/RDMFHRentals/select_state.jsp.

*To receive a LOPE letter or learn more about this option, contact Miriam Haylett at (208) 779-3437, extension 4.*

## TRANSFER OF RENTAL ASSISTANCE TO ANOTHER RD PROPERTY

You may currently be receiving Rural Development Rental Assistance (RA) to help pay your rent. Upon prepayment of the mortgage, RA will no longer be available.  However, if you request, the **RA currently assigned to your unit can be transferred to another Rural Development property to which you want to move**.

- You have up to four months after the owner pays off the mortgage to transfer and begin using the RA.
- If RA is transferred, your rent should not change from what it is currently since your rent is based on 30% of your income.
- RA cannot be transferred to a Rural Development-financed property that is 100% Section 8.   (Management at the RD property will be able to tell you whether or not the property is 100% Section 8.)
- You cannot use RA in combination with a Rural Development Voucher.  However, you can use the LOPE letter to get to the top of the waiting list, and then use the transferred RA to help you pay the rent.
- You cannot transfer RA unless you are currently receiving it.

**For more information on the transfer of Rental Assistance, contact RDVPO at (844) 857-5386, extension 4.**

## AVAILABILITY OF THE PORTABLE RURAL DEVELOPMENT VOUCHER

If you lived in the property on the date of actual prepayment, you may be eligible to receive a Rural Development Voucher to assist in paying your rent in your current unit or elsewhere.

The Rural Development Voucher Program was created to offer some protection to eligible multifamily housing tenants of properties whose complex may be subject to economic hardship (for example, higher rents) as a result of the loan prepayment or foreclosure.  The Rural Development Voucher will help tenants by providing monthly payments of rental subsidy that will supplement the tenant's rent payment.  USDA will set-aside 12 months of rental subsidy if you are eligible, and if you return the Voucher Obligation form, as described below, within 10 months from the date of prepayment.

Eligible tenants may use the RD voucher to supplement rent at any rental unit in the United States, including your current unit, if –

1. The owner of the unit will accept a RD Voucher; and
2. The unit is in acceptable physical condition; and
3. The unit is not already subsidized by Section 8 or as a public housing unit.

You should also understand the following information:

- You must be a citizen, United States non-citizen national or qualified alien to be eligible for the RD Voucher Demonstration Program.
- A citizenship declaration form is enclosed.  Each household member must complete this form. The RD voucher cannot be issued until we receive this form signed by the RD Voucher holder.
- Even if you were not previously receiving Rural Development Rental Assistance (RA), you may be eligible to receive a Rural Development Voucher.
- Your RD Voucher will provide 12 months of payment.  Any extension is dependent on funding.
- **If you receive a HUD Housing Choice Voucher or live at a HUD subsidized property, you may not use your RD Voucher in combination with this HUD subsidy**.  This means that in some instances, it may be more beneficial for you to give up your RD Voucher than to keep it.
- **Availability of an RD Voucher is dependent on funding**.  This means that the RD Voucher is issued only if funding is available when your Voucher Obligation Form (VOF) is returned.  Lack of availability could cause a temporary delay in use of the Voucher, or if funding is withdrawn, mean that Voucher payments cannot begin at all.
- You must use your RD Voucher within 60 days of issuance.  See additional information below in "Next Steps" for what this timeframe could mean.

- The amount of your RD Voucher cannot exceed the rent for your unit. If you want to use this voucher at another property where the amount of the voucher exceeds the rent, the voucher will be reduced to equal the rent. Your voucher amount could increase back to its original amount if your rent then increased above the voucher amount.

This letter provides your final eligibility and award amount determinations based on your circumstances on the date of prepayment. If you moved from the property prior to the date of prepayment, you are not eligible to receive a voucher. If your net tenant contribution changed prior to prepayment, you may be ineligible to receive a voucher or your voucher amount may have changed.

## FINAL VOUCHER AMOUNT DETERMINATION

The value of the Rural Development Voucher for which you are eligible has been established at $1,206.00 per month. See the attached Eligibility Determination.

If this amount is $0, this is because either you are ineligible (your annual income is above 80% of the Median family income, as explained in the attachment), or because your tenant contribution at the prepaying property was equal to or greater than the comparable market rent for your apartment unit size. See attached "Eligibility Information" for an explanation of how this voucher amount was calculated.

As stated above, the amount of your RD Voucher cannot exceed the rent for your unit. If you want to use this voucher at a property where the amount of the voucher exceeds the rent, the voucher will be reduced to equal the rent.

## NEXT STEPS (THESE STEPS DO NOT APPLY TO YOU IF YOUR VOUCHER AMOUNT = $0)

Our records indicate that you have not returned one or both of the following documents: a tenant-signed Voucher Obligation Form and document providing proof of citizenship.

If you are interested in receiving a Rural Development Voucher, you must **submit the enclosed "Voucher Obligation Form" and return the original document along with the completed citizenship declaration form** to USDA at the following address:

**United States Department of Agriculture**
**Attn:  USDA RD Voucher Program**
**PO Box 775220**
**St. Louis, MO 63177**

*You have 10 months from the date of prepayment* to return the original, signed VOF and citizenship declaration *form to USDA. Returning the forms will generate the RD Voucher for you to use. RD Vouchers will be issued within 30 days of your return of the Voucher Obligation Form or 30 days after the sale, whichever is later.*

You should use your RD Voucher within 60 days of issuance. Therefore, return the Voucher Obligation Form (VOF) and proof of citizenship document approximately 90 days before you expect to use the RD Voucher with a new lease. Timing considerations for returning the VOF would include when your lease expires or, if you wish to move immediately and your lease has not yet expired, the date when you and your landlord mutually agree to terminate your lease. You may submit a written request for an extension of 60 days to use the voucher. The maximum voucher search period for any family participating in the Rural Development Voucher Program is 120 days. After that time, the RD Voucher will no longer be available.

### Final RD Voucher Eligibility Determination

Eligibility to receive a voucher is based on your adjusted income indicated on the Tenant Certification in effect on the date of loan prepayment.  Only those tenants who are low-income are eligible to receive a voucher. "Low-income" is defined as an annual adjusted income at or below 80% of median family income.

The median family income for your area is $80,600.00 and 80% of that figure is $64,480.00.

**If your adjusted income is at or below 80% of the median family income, you are income-eligible for the Rural Development Voucher Program.**

**If your adjusted income is not at or below 80% of median family income, you are not income-eligible for the Rural Development Voucher Program.**

### Final RD Voucher Amount Determination

The amount of your Rural Development Voucher was calculated as follows:

|  | $1,406.00 | Area market rent for your unit in the area where you rent at the time of prepayment |
|---|---|---|
| Minus | $200.00 | Net tenant contribution toward rent on date of prepayment |
|  | $1,206.00 | Maximum Amount of your Rural Development Voucher |

**Remember that the amount of the voucher cannot exceed the amount of tenant rent; therefore, your voucher amount will be adjusted downward if you choose a unit where the maximum voucher amount exceeds the tenant rent.  If this occurs, the voucher amount could later be adjusted back up to the maximum if your tenant rent changes to exceed the voucher amount.**

*Si le gustaría recibir una copia de este documento en español, llame a RD Voucher Program a nuestra línea gratis al 1-844-857-5386.*

HT000002704

**USDA** United States Department of Agriculture



**¡Este documento es importante, tradúzcalo inmediatamente!**

Rural Development

Multi-Family Housing
Attn. USDA RD
Voucher Program

PO Box 775220
St. Louis, MO
63177

Voice 844 857 5386
Fax 844 677 2890

Email
rdvoucher@usda.gov

April 26, 2023

GUADALUPE CHAVEZ
911 Avenida Canada
Unit 48
ESPANOLA, NM 87532

Tenant ID:  2017067

**Re:  Voucher Package**

Dear GUADALUPE CHAVEZ:

This letter provides the Rural Development (RD) Voucher that you requested.  The RD Voucher assures a potential landlord that you have additional financial resources with which to pay your rent.

After selecting a rental unit, you must return the following documents in order to receive your housing assistance –

1. <u>RD Voucher</u>.  Two (2) vouchers are enclosed.  Please sign and return one form.  *The person whose name is listed on this letter must sign the voucher.  This original form must then be returned – we cannot accept a photocopy of the signature.  The other form is for your records.*

2. <u>Request for Tenancy Approval (RTA) and Disclosure of Information on Lead-based Paint (LBP)</u>. Complete both forms with the Owner/Manager of the unit you select to rent.

*All information provided will be available to USDA but will be otherwise kept confidential.*

**Return documents no later than 06/25/2023 to –**
**United States Department of Agriculture**
**Attn:  USDA RD Voucher Program**
**PO Box 775220**
**St. Louis, MO 63177**

If these documents are not returned by this deadline, you may not be able to receive this housing assistance.  One 60-day extension may be granted upon request, as long as RD Voucher funding is available.  Call RD Voucher Program at 1-844-857-5386 to request a voucher extension.

---

Next Steps

Rural Development must determine that the rental unit selected is in decent, safe and sanitary condition before approving your tenancy.  After receiving the three documents referenced above, Rural Development will, if necessary, contact the prospective landlord and schedule a date to perform a unit inspection.

If the unit is deemed acceptable, Rural Development will enter into a Housing Assistance Payment (HAP) contract with the owner to pay a portion of your rent.  We will mail the owner a completed HAP Contract for signature after the unit passes inspection. <u>When the owner returns the signed HAP contract, the owner must also return a lease that incorporates the Tenancy Addendum that will be included with the HAP contract</u>.  To receive a sample HAP Contract and Tenancy Addendum, please contact RD Voucher Program toll-free at 1-844-857-5386.

Remember that it is an owner's right to accept or decline a voucher.  Even with an RD Voucher tenants are required to meet an owner's tenant selection criteria in order to rent a unit.   Also remember that RD Vouchers

Page 5 of 8

CL000000602

may not be used in combination with a HUD Housing Choice Voucher, at a Public Housing unit, or at a HUD property with existing rental assistance.

| Questions |
| --- |

If you, or the Owner/Owner Representative, have any questions or concerns about the RD Voucher, please call RD Voucher Program toll-free at 1-844-857-5386.  Personnel will be able to help you within the hours of 8:00 AM and 4:00 PM Central Time.   After those hours or if the line is busy, you will be able to leave a message.

You may also e-mail questions to RDVoucher@usda.gov. Responses will be promptly provided to both phone call messages and e-mails.

Sincerely,

Michael Resnik
Policy & Budget Branch Chief
USDA Rural Development
Multifamily Housing
Asset Management Division

Enclosures:  RD Voucher (2 copies); Request for Tenancy Approval; Disclosure of Information on Lead-Based Paint Hazards

*Si le gustaría recibir una copia de este documento en español,*
*llame a RD Voucher Program a nuestra línea gratis al 1-844-857-5386.*



**Voucher**
~~Housing Choice Voucher Program~~
**Rural Development Voucher Program**

~~**US Department of Housing**~~
~~**and Urban Development**~~
~~Office of Public and Indian Housing~~

OMB No. 2577-0169
~~(exp. 09/30/2012)~~

Public Reporting Burden for this collection of information is estimated to average 0.05 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information.
This collection of information is authorized under Section 8 of the U.S. Housing Act of 1937 (42 U.S.C. 1437f). The information is used to authorize a family to look for an eligible unit and specifies the size of the unit. The information also sets forth the family's obligations under the ~~Housing Choice Voucher Program~~ Rural Development Voucher Program.

| | | |
|---|---|---|
| Please read **entire** document before completing form Fill in all blanks below. Type or print clearly. | | Voucher Number |
| 1. Insert **unit size in number of bedrooms. (This is the number of bedrooms for which the Family qualifies, and is used in determining the amount of assistance to be paid on behalf of the Family to the owner.)** Total 12-month Value of Voucher | | 1. ~~Unit Size~~ Value of Voucher $10,596.00 |
| 2. **Date Voucher Issued (mm/dd/yyyy)** Insert actual date the Voucher is issued to the Family. | | 2. Issue Date (mm/dd/yyyy) 04/26/2023 |
| 3. **Date Voucher Expires (mm/dd/yyyy)** Insert date sixty days after date Voucher is issued. (See Section 6 of this form.) | | 3.. Expiration Date (mm/dd/yyyy) 06/25/2023 |
| 4. **Date Extension Expires** (if applicable) (mm/dd/yyyy) (See Section 6. of this form) | | 4. Date Extension Expires (mm/dd/yyyy) 08/24/2023 |
| 5. Name of Family Representative GUADALUPE CHAVEZ | 6. Signature of Family Representative | Date Signed (mm/dd/yyyy) |
| 7. Name of Public Housing Agency (PHA)/**OAE/RD Office** **U.S. Department of Agriculture** | | |
| 8. Name and Title of PHA Official/**OAE/RD Office** Michael Resnik, Policy & Budget Branch Chief USDA Rural Development Multifamily Housing Asset Management Division | 9. Signature of ~~PHA~~ Official | Date Signed (mm/dd/yyyy) |

1. ~~Housing Choice~~ Rural Development Voucher Program

A. RD ~~The public housing agency (PHA)~~ has determined that the above named family (item 5) is eligible to participate in the ~~housing choice~~ Rural Development (RD) voucher program (RDVP). Under this program, the family chooses a decent, safe, and sanitary unit to live in. If the owner agrees to lease the unit to the family under the ~~housing choice~~ RD voucher program, and if the ~~(public housing agency, other administering entity or Rural Development office, collectively referred to as "PHA")~~ PHA approves the unit,RD ~~the PHA~~ will enter into a housing assistance payments (HAP) contract with the owner to make monthly payments to the owner to help the family pay the rent.

B. ~~RD the PHA determines the amount of the monthly housing assistance payment to be paid to the owner. Generally, the monthly housing assistance payment by RD the PHA is the difference between the applicable payment standard and 30 percent of monthly adjusted family income. In determining the maximum initial housing assistance payment for the family, RD the PHA will use the payment standard in effect on the date the tenancy is approved by RD the PHA. The family may choose to rent a unit for more than the payment standard, but this choice does not change the amount of RD the PHA's assistance payment. The actual amount of RD the PHA's assistance payment will be determined using the gross rent for the unit selected by the family.~~

2. **Voucher**

A. When issuing this voucher RD ~~the PHA~~ expects that if the family finds an approvable unit, RD ~~the PHA~~ will have the money available to enter into a HAP contract

with the owner. However, RD ~~the PHA~~ is under no obligation to the family, to any owner, or to any other person to approve a tenancy. RD ~~the PHA~~ does not have any liability to any party by the issuance of this voucher.

B. The voucher does not give the family any right to participate in ~~the PHA's housing choice~~ RD voucher program. The family becomes a participant in ~~the PHA's housing choice~~ RD voucher program when the HAP contract between RD the PHA and the owner takes effect.

C. During the initial or any extended term of this voucher, RD ~~the PHA~~ may require the family to report progress in leasing a unit at such intervals and times ad determined by RD ~~the PHA.~~

3. **RD PHA approval or Disapproval of Unit or Lease**

A. When the family finds a suitable unit where the owner is willing to participate in the program, the family must give RD ~~the PHA~~ the request for tenancy approval (on the form supplied by RD ~~the PHA),~~ signed by the owner and the family, and a copy of the lease, including the USDA ~~HUD~~-prescribed tenancy addendum. **Note:** both documents must be given to RD ~~the PHA~~ no later than the expiration date stated in item 3 or 4 on top of page one of this voucher.

B. The family must submit these documents in the manner that is required by RD ~~the PHA.~~ RD ~~PHA~~ policy may prohibit the family from submitting more than one request for tenancy approval at a time.

C. The lease must include, word-for-word, all provisions of the tenancy addendum required by ~~HUD~~ RD and supplied by RD. This is done by adding the ~~HUD~~ USDA tenancy addendum to the lease used by the owner. If there is a difference between any provisions of the owner's lease, the provisions of the USDA ~~HUD~~ tenancy addendum shall control.

D. After receiving the request for tenancy approval and a copy of the lease, RD ~~the PHA~~ will inspect the unit. RD

CL000000603

~~The PHA~~ may not give approval for the family to lease the unit or execute the HAP contract until RD ~~the PHA~~ has determined that all the following program requirements are met: the unit is eligible; the unit has been inspected by RD ~~the PHA~~ and passes the RD inspection ~~housing quality standards (HQS); the rent is reasonable~~; and the landlord and tenant have executed the lease including the USDA ~~HUD~~-prescribed tenancy addendum.

E.   If RD ~~the PHA~~ approves the unit, RD ~~the PHA~~ will notify the family and the owner, and will furnish two copies of the HAP contract to the owner.

1.   The owner and the family must execute the lease.

2.   The owner must sign both copies of the HAP contract and must furnish to RD ~~the PHA~~ a copy of the executed lease and both copies of the executed HAP contract.

3.   RD ~~The PHA~~ will execute the HAP contract and return an executed copy to the owner.

F.   If RD ~~the PHA~~ determines that the unit or lease cannot be approved for any reason, RD ~~the PHA~~ will notify the owner and the family that:

1.   The proposed unit or lease is disapproved for specified reasons, and

2.   If the conditions requiring disapproval are remedied to the satisfaction of RD ~~the PHA~~ on or before the date specified by RD ~~the PHA,~~ the unit or lease will be approved.

4.   **Obligations of the Family**

A.   When the family's unit is approved and the HAP contract is executed, the family must follow the rules listed below in order to continue participating in the ~~housing choice~~ RD voucher program.

B.   The family must:

1.   Supply any information that RD ~~the PHA,~~ or USDA ~~HUD~~ determines to be necessary including evidence of citizenship or eligible immigration status, and information for use in a regularly scheduled reexamination or interim reexamination of family income and composition.

2.   ~~Disclose and verify social security numbers and sign and submit consent forms for obtaining information.~~

3.   Supply any information requested by ~~the PHA~~ RD to verify that the family is living in the unit or information related to family absence from the unit.

4.   Promptly notify RD ~~the PHA~~ in writing when the family is away from the unit for an extended period of time in accordance with RD ~~PHA~~ policies.

5.   Allow RD ~~the PHA~~ to inspect the unit at reasonable times and after reasonable notice.

6.   Notify RD ~~the PHA~~ and the owner in writing before moving out of the unit or terminating the lease.

7.   Use the assisted unit for residence by the family. The unit must be the family's only residence.

8.   ~~Promptly notify the PHA in writing of the birth, adoption, or court awarded custody of a child.~~

9.   ~~Request PHA written approval to add any other family member as an occupant of the unit.~~

10.  Promptly notify RD ~~the PHA~~ in writing if any family member no longer lives in the unit.

11.  Give RD ~~the PHA~~ a copy of any owner eviction notice.

12.  Pay utility bills and provide and maintain any appliances that the owner is not required to provide under the lease.

C.   Any information the family supplies must be true and complete.

D.   The family (including each family member) must not:

1.   Own or have any interest in the unit (other than in a cooperative, or the owner of a manufactured home leasing a manufactured home space).

2.   Commit any serious or repeated violation of the lease.

3.   Commit fraud, bribery or any other corrupt or criminal act in connection with the program.

4.   Engage in drug-related criminal activity or violent criminal activity or other criminal activity that threatens the health, safety or right to peaceful enjoyment of other residents and persons residing in the immediate vicinity of the premises.

5.   Sublease or let the unit or assign the lease or transfer the unit.

6.   Receive ~~housing choice~~ RD voucher program housing assistance while receiving another housing subsidy, for the same unit or a different unit under any other Federal, State or local housing assistance program.

7.   Damage the unit or premises (other than damage from ordinary wear and tear) or permit any guest to damage the unit or premises.

8.   Receive ~~housing choice~~ RD voucher program housing assistance while residing in a unit owned by a parent, child, grandparent, grandchild, sister or brother of any member of the family, unless RD ~~the PHA~~ has determined (and has notified the owner and the family of such determination) that approving rental of the unit, notwithstanding such relationship, would provide reasonable accommodation for a family member who is a person with disabilities.

9.   Engage in abuse of alcohol in a way that threatens the health, safety or right to peaceful enjoyment of the other residents and persons residing in the immediate vicinity of the premises.

5.   **Illegal Discrimination**

If the family has reason to believe that, in its search for suitable housing, it has been discriminated against on the basis of age, race, color, religion, sex, disability, national origin, or familial status; the family may file a housing discrimination complaint with any USDA ~~HUD~~ Field Office in person, by mail, or by telephone. RD ~~The PHA~~ will give the family information on how to fill out and file a complaint.

6.   **Expiration and Extension of Voucher**

The voucher will expire on the date stated in item 3 on the top of page one of this voucher unless the family requests an extension in writing and RD ~~the PHA~~ grants a written extension of the voucher in which case the voucher will expire on the date stated in item 4. At its discretion, RD ~~the PHA~~ may grant a family's request for one or more extensions of the initial term.

**LA VISTA DEL RIO APARTMENTS, A LIMITED PARTNERSHIP**

566 TURNER LANE
SHERIDAN, WY 82801
307 672-0407

March 15, 2023

RE: CLOSURE OF COMPLEX

Dear Residents:

The City of Espanola refuses to protect the residents of this complex, the police will not arrest anyone who is conducting illegal activity on-site, the police will not arrest or remove any persons, who are trespassing and most times, the Police will not even show up at the complex, when called by Management. The illegal activity is so out of control, that the living conditions are unsafe, and are so dire, that the Owner has no other choice, but to CLOSE this complex.

Therefore, for the safety of all involved, this complex will be closed April 1, 2023. All Tenants will receive the Security Deposit, that was paid, without any deductions.

The Water, Sewer, Gas, Electric, Trash Removal, will cease, April 1, 2023. All Main Entry door will be locked April 1, 2023 and all Windows will be boarded up, April 1, 2023.

Sincerely,



General Partner of La Vista Del Rio Apartments, A Limited Partnership

"THIS INSTITUTION IS AN EQUAL OPPORTUNITY PROVIDER"




**LA VISTA DEL RIO APARTMENTS, A LIMITED PARTNERSHIP**

566 TURNER LANE
SHERIDAN, WY 82801
307 672-0407

March 23, 2023

RE: CLOSURE OF COMPLEX CANCELLED

Dear Residents:

United Stated Department of Agriculture – Rural Development demands that this complex remain open, even though the constant, continuous, dangerous illegal activity is still on-going.

Since the illegal activity has not and probably will not be abated, by the appropriate authorities, for your own safety, we advise you to vacate your unit, as soon as possible. Please advise the Manager, if you intend to vacate your unit and your anticipated date of departure.

If you remain living at this complex, you are living there at your own risk, and you are totally responsible for your safety and you are totally responsible for the safety of all members of your household and your guests.

The Water, Sewer, Gas, Electric, Trash Removal, will remain operational, to the common areas and legally occupied apartments.



General Partner of La Vista Del Rio Apartments, A Limited Partnership

"THIS INSTITUTION IS AN EQUAL OPPORTUNITY PROVIDER"

 

EQUAL HOUSING
OPPORTUNITY

Exhibit 14

# PURCHASE AGREEMENT
## Offer

BUYER NAME(s): LA Vista Del Rio 1 LLC  and/or assigns

SELLER NAME(s): LA VISTA DEL RIO APTS

PROPERTY ADDRESS and/or DESCRIPTION: Buyer agrees to purchase, and Seller agrees to sell the real property identified as:

Beginning at a point which bears S. 68° 21 1 34" W., a distance of 1163.15 feet; thence S. 9 ° 27' 24" E., a distance of 295. 00 feet; thence S. 7 ° 02 1 35'' E., a distance of 315.28 feet from the NE corner of Sec. 1, T20N, R8E, N.  .P.M., said point being on the Easterly right-of-way line of El Llano Road; thence bearing N. 80° 32' 36" E., a distance of 144.96 feet to a point; thence along a curve ° to the left having a radius of 50.00 feet an arc length of 104. 72 feet (ch= N. 80 32' 36" E., 86.60) to a point; thence bearing N. 80° 32' 36" E., a distance of 426.70 feet to a point; thence along a curve to the right having a radius of 25.00 feet an arc length of 39.27 feet (ch= S 54 ° 27' 24" E., 35.36) to a point; thence bearing S. 9 ° 27' 42" E., a distance of 73.00 feet to a point; thence along a curve to the left having a radius of 113. 795 feet an arc length of 12.02 feet (ch= S. 12 ° 29' 00" E., 12.02) to a point; thence bearing S. 80° 32' 36" W., a distance of 150.6 3 feet to a point; thence bearing S. 68° 43' 40" W., a distance of 290.57 ·feet to a point; thence bearing N. 87 ° 41' 56" W., a distance of 259. 21 feet to a point, said point being on the Easterly right-of-way line of El Llano Road; thence bearing N. 7 ° 02' 35'' W., a distance of 116. 78 feet along said right-of-way line to the point of beginning, containing 90,603.510 square feet, more or less.

PURCHASE PRICE: $550,000.00

CLOSING, EXPIRATION, & POSSESSION DATE On or before August 31, 2023. This is the date that the sale will conclude, and buyer will take full possession of the property and the seller will in turn receive the funds associated with said transfer. This is contingent upon City of Española terminating in writing contract for their purchase.

Buyer will have access to the property beginning the date of acceptance to work on road, structures, or any other obstacles necessary to prepare the property to live and enjoy during this time without hinderance or objection by the seller. Seller will provide all keys to any gates or doors that would restrict the buyers use and enjoyment of said premises upon acceptance of this contract.

(h) CLOSING COSTS: Unless otherwise stated in Special Stipulations or Addenda, closing costs are to be paid as follows: Seller must pay all Seller's existing loans, liens and related costs affecting the sale of the property, the balance on any leased items that remain with the property, Buyer will pay all closing costs. Any existing rental or lease deposits must be transferred to Buyer at closing. Buyer must pay transfer taxes, deed and deed of trust recording fees, association transfer fees, hazard and any other required insurance, All settlement fees.

(i) PRORATIONS, TAXES & ASSESSMENTS: The current year's property taxes, any existing tenant leases or rents, association or maintenance fees, (and if applicable, any remaining fuel), will be prorated as of the date of closing. Taxes for prior years and any special assessments approved before date of closing must

Page 1

Exhibit 15

be paid by Seller at or before closing. If applicable, roll back taxes or any tax or assessment that cannot be determined by closing date should be addressed in Special Stipulations or Addenda and will survive the closing.

(j) HOME PROTECTION PLANS: Sale will be as is.

x _____

La Vistas Del Rio 1, LLC

x _____ 8/25/23 _____

Date of Acceptance

x _____

John Bosley, LA VISTA DEL RIO APTS

x _____ 8/25/23 _____

Date of Acceptance

**John A. Bosley, Partner of WHG
Partnership, the General Partner
of the Limited Partnership**

**REST OF THIS PAGE INTENTIONALLY LEFT BLANK**

Page 2

Lot Forty-five (45), in **Block numbered Forty-three (43)**, and Lot numbered Thirty-three (33) in **Block numbered Forty-four (44)**, of **RIO RANCHO ESTATES, UNIT 21**, as the same is shown and designated on the plat entitled, "BLOCKS 37 THRU 53, MULTIPLE TRACTS CC, DD, EE, FF, & GG AND COMMERCIAL TRACT E, UNIT TWENTY-ONE, RIO RANCHO ESTATES, SANDOVAL COUNTY, NEW MEXICO", filed in the office of the County Clerk of Sandoval County, New Mexico, on December 9, 1969, in Rio Rancho Estates Plat Book 2, page 11.

## Addendum No. 1

This addendum is to serve as an extension of the contract executed August 25, 2023. The closing will be on or before September 15, 2023. All other terms will remain the same as contained in the original contract.

X _____

La Vistas Del Rio 1, LLC

X _____8/30/23_____

Date of Acceptance

X _____

John Bosley, LA VISTA DEL RIO APTS

X _____8/30/23_____

Date of Acceptance

**REST OF THIS PAGE INTENTIONALLY LEFT BLANK**



e - R e c o r d e d 2020789   10 / 03 / 23   S F C

**RESTRICTIVE USE COVENANT - THE LAST EXISTING TENANT**

**Use if No Impact on Minorities but There is Not an Adequate Supply of Housing (7 CFR 3560.662(b)(2))**

**WHEREAS,** LA VISTA DEL RIO APARTMENTS, A LIMITED PARTNERSHIP "Owner", or a predecessor in interest, received a loan from the United States of America, acting through the Rural Housing Service in Rural Development (Agency), U.S. Department of Agriculture which was evidenced by a promissory note or assumption agreement dated 4/15/1985 , in the original amount of $1,612,000.00 and secured by a certain Deed of Trust or Mortgage dated 4/15/1985 , and recorded in the land records for the County of SANTA FE , State of NEW MEXICO .

for the purpose of providing housing in accordance with Section 42 U.S.C. 1484 (Section 514) or 1485 (Section 515), whichever is applicable, and Title V of the Housing Act of 1949, as amended "Program"; and

**NOW, THEREFORE,** in consideration of the restrictions on the Property as further described in Exhibit A, the sum of Ten Dollars ($10) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties, for themselves and for their respective successors and assigns, hereby covenant and agree as follows:

(1) **Use Requirement.** The Owner, and any successors in interest, agree to use the Property in compliance with 42 U.S.C. § 1484 or § 1485, whichever is applicable, and 7 CFR part 3560, and any other applicable regulations and amendments, for the purpose of housing program eligible very low-, low-, or moderate-income tenants.

(2) **Enforcement.** The Agency and program eligible tenants or applicants may enforce these restrictions as long as the Agency has not terminated the Restrictive Use Agreement pursuant to paragraph 7 below.

(3) **Displacement Prohibition.** The Owner agrees not to refuse to lease a dwelling unit offered for rent, or otherwise discriminate in the terms of tenancy, solely because any tenant or prospective tenant is the recipient of housing assistance from the Agency or any other Federal agency.

(4) **Owner's Responsibilities.** The Owners agrees to: set rents, other charges, and conditions of occupancy in a manner to meet the restrictions required by this Restrictive Use Covenant; post an Agency approved notice of these restriction for the tenants of the property; to adhere to applicable local, State, and Federal laws; and to obtain Agency concurrence for any rental procedures that deviate from those approved at the time of prepayment, prior to implementation.

(5) **Civil Rights Requirements.** The Owner will comply with the provisions of any applicable Federal, State or local law prohibiting discrimination in housing on the basis of race, color, religion, sex, national origin, handicap or familial status, including but not limited to: Title VI of the Civil Rights Act of 1964 (Public Law 90-284, 82 Stat. 73), the Fair Housing Act, Executive Order 11063, and all requirements imposed by or pursuant to the Agency regulations implementing these authorities, including, but not limited to, 7 CFR 3560.104.

(6) **Release of Obligation.** The Owner will be released from the obligation under this Restrictive Use Covenant when the Agency has determined that the last existing tenant at the date of prepayment has left or when the Agency determines that there is a no longer a need for the

Exhibit 16

e-Recorded 2020789  10/03/23 SFC

housing or that HUD Section 8 vouchers provided the residents of the housing will no longer be provided due to no fault, action or lack of action on the part of the Owner.

(7) **Violations; the Agency's Remedies.** The parties further agree that upon any default under this covenant, the Agency may apply to any court, State or Federal, for specific performance of this Agreement, for an injunction against violation of this covenant or for such other equitable relief as may be appropriate, since the injury to the Agency arising from a violation under any of the terms of this covenant would be irreparable and the amount of damage would be difficult to ascertain.

(8) **Covenants to Run with Land**. The Owner hereby subjects the Property to the covenants, reservations and restrictions set forth in this covenant. The Owner hereby declares its express intent that the covenants, reservations and restrictions set forth herein shall be deemed covenants running with the land to the extent permitted by law and shall pass to and be binding upon the successors in title to the Property. Each and every contract, deed, mortgage or other instrument hereafter executed covering or conveying the Property or any portion thereof shall conclusively be held to have been executed, delivered and accepted subject to such covenants, reservations and restrictions, regardless of whether such covenants, reservations and restrictions are set forth in such contract, deed or other instrument. The Agency hereby agrees that, upon the request of the Owner made after the release of obligations established in paragraph 7 of this covenant, the Agency shall execute a recordable instrument approved by the Agency for purposes of releasing this covenant of record. All costs and expenses relating to the preparation and recording of such release shall be paid by the Owner.

(9) **Superiority.** The document hereto constitutes a restrictive covenant that is filed of record, with all other Deeds of Trusts or Mortgages, and that, notwithstanding a foreclosure or transfer of title pursuant to any other instrument or agreement, the restrictive covenants and provisions hereunder shall remain in full force and effect.

(10) **Subsequent Modifications and Statutory Amendments.** The Agency may implement modifications necessitated by any subsequent statutory amendment without the consent of any other party, including those having the right of enforcement, to require that any third-party obtain prior Agency approval for any enforcement action concerning preexisting or future violations of this covenant.

(11) **Other Agreements.** The Owner represents and warrants that it has not and will not execute any other agreements with provisions contradictory or in opposition to the provisions of this covenant and that, in any event, the provisions of this covenant are paramount and controlling as to the rights and obligations set forth herein and supersede any other conflicting requirements.

(12) **Binding Effect.** Upon conveyance of the Property during the term, the Owner shall require its successor or assignee to assume its obligations under this covenant. In any event, this covenant shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and/or assigns.

(13) **Amendment.** This covenant may not be modified except by an instrument in writing executed by each of the parties that are signatories hereto.

(14) **Severability.** Notwithstanding anything herein contained, if any one or more of the provisions of this covenant shall for any reason whatsoever be held to be illegal, invalid or unenforceable in any respect, such illegality, invalidity or unenforceability shall not affect any other provision of this

covenant, but this covenant shall be construed as if such illegal, invalid or unenforceable provision had never been contained herein.

**(15)Headings.** The headings and titles to the sections of this covenant are inserted for convenience only and shall not be deemed a part hereof nor affect the construction or interpretation of any provisions hereof.

**(16) Governing Law.** This covenant shall be governed by all applicable Federal laws.

IN WITNESS WHEREOF, the parties hereto have caused this Restrictive Use Covenant to be executed and made effective as of the date first above written.

OWNER:  LA VISTA DEL RIO APARTMENTS,

A_  LIMITED PARTNERSHIP  _ _

Date: _ 9/06/2023 _ _ _ _ _ _

By: 

Name:  JOHN A. BOSLEY

Title:  PARTNER OF WHG PARTNERSHIP, THE
GENERAL PARTNER OF THE LIMITED
PARTNERSHIP.

WITNESS/ATTEST: 

Attached Exhibit A – LEGAL DESCRIPTION

DESIREE D. WITALA - NOTARY PUBLIC
County of Sheridan
State of Wyoming
My Commission Expires December 02, 2023

| COUNTY OF SANTA FE      } | RESTRICTIVE COVENANTS |
|---|---|
| STATE OF NEW MEXICO   } ss | PAGES: 4 |

I Hereby Certify That This Instrument Was e-Recorded for Record On The 3RD Day Of October, A.D., 2023 at 09:13:48 AM And Was Duly Recorded as Instrument # 2020789 Of The Records Of Santa Fe County

Witness My Hand And Seal Of Office
Katharine E. Clark
Deputy - KVAUGHN        County Clerk, Santa Fe, NM

e-Recorded 2020789   10 / 03 / 23   S F C

## EXHIBIT "A"

Beginning at a point which bears S 68° 21' 34", a distance of 1163.15 feet; thence S 9° 27' 24" E., a distance of 295.00 feet; thence S 7° 02' 35" E., a distance of 315.28 feet from the NE corner of Sec. 1, T20N, R8E, N.M.P.M., said point being on the Easterly right-of-way line of El Llano Road; thence bearing N 80° 32' 36" E., a distance of 144.96 feet to a point; thence along a curve to the left having a radius of 50.00 feet an arc length of 104.72 feet (ch=N. 80° 32' 36" E., 86.60) to a point, thence bearing N 80° 32' 36" E., a distance of 426.70 feet to a point; thence along a curve to the right having a radius of 25.00 feet an arc length of 39.27 feet (ch= S 54° 27' 24" E., 35.36) to a point; thence bearing S 9° 27' 24" E., a distance of 73.00 feet to a point; thence along a curve to the left having a radius of 113.795 feet an arc length of 12.02 feet (ch= S 12° 29' 00" E., 12.02) to a point; thence bearing S 80° 32' 36" W., a distance of 150.63 feet to a point; thence bearing S 68° 43' 40" W., a distance of 290.57 feet to a point; thence bearing S 87° 41' 56" W., a distance of 259.21 feet to a point; said point being on the Easterly right-of-way line of El Llano Road; thence bearing N 7° 02' 35" W., a distance of 116.78 feet along said right-of-way line to the point of beginning, containing 90,603.510 square feet more or less.

Also known as: All of Lots 37 through 43 inclusive and a portion of Lot 44, of La Vista Del Rio Subdivision, Phase 1, as shown on Subdivision Plat filed in Book 102, page 23, records of Santa Fe County New Mexico.

AND

Beginning at a point which bears S 68° 21' 34" W., a distance of 1163.15 feet, thence S 9° 27' 24" E., a distance of 295.00 feet; thence S 7° 02' 35" E., a distance of 265.24 feet; thence N 80° 32' 36" E., a distance of 551.17 feet from the NW corner of Sec. 1, T20N, R8E, N.M.P.M., thence bearing N 9° 27' 24" W., a distance of 120.00 feet to a point; thence bearing N 80° 32' 36" E., a distance of 300.00 feet to a point; thence bearing S 85° 21' 01" E., a distance of 87.62 feet to a point; thence bearing S 77° 42' 24" E., a distance of 45.50 feet to a point; thence bearing S 37° 53' 55" W., a distance of 231.44 feet to a point; thence bearing S 80° 32' 36" W., a distance of 58.70 feet to a point; thence along a curve to the left having a radius of 50.00 feet an arc length of 104.72 feet (ch= N 39° 27' 24" W., 86.60) to a point; thence bearing S 80° 32' 36" W., a distance of 155.00 feet to the point of beginning, containing 53,016.317 square feet, more or less.

Also known as: All of Lots 33 through 36 inclusive, of La Vista Del Rio Subdivision, Phase 1, as shown on Subdivision Plat filed in Book 102, page 23, records of Santa Fe County, New Mexico.

e-Recorded 2020267 09/25/23 SFC

## Warranty Deed

LA Vista Del Rio 1 LLC, a New Mexico limited liability company, for consideration grant to Villas de Avenida Canada LLC, a New Mexico limited liability company the following described real estate in Santa Fe County, New Mexico:

"Exhibit A"

SUBJECT TO: Restrictions, Reservations and Easements of record.

With warranty covenants.

| COUNTY OF SANTA FE   } | WARRANTY DEED |
|---|---|
| STATE OF NEW MEXICO   } ss | PAGES: 2 |

I Hereby Certify That This Instrument Was e-Recorded for Record On The 25TH Day Of September, A.D., 2023 at 12:32:59 PM And Was Duly Recorded as Instrument # 2020267 Of The Records Of Santa Fe County

Witness My Hand And Seal Of Office
Katharine E. Clark

Deputy - GLUJAN          County Clerk, Santa Fe, NM

Witness this 25 day of September 2023.

LA Vista Del Rio 1 LLC

James Gomez, Managing Member



ACKNOWLEDGMENT FOR NATURAL PERSONS

STATE OF NEW MEXICO

COUNTY OF SANTA FE

This instrument was acknowledged before me on September 25, 2023 by James A. Gomez managing member.

My Commission Expires: Sept 17, 2024

Notary Public

HUGO MEDINA-HERNANDEZ
Notary Public - State of New Mexico
Commission # 1130589
My Comm. Expires September 17, 2024

Exhibit 17

e-Recorded 2020267 09/25/23 SFC

"Exhibit A"

Beginning at a point which bears S 68° 21' 34", a distance of 1163.15 feet; thence S 9° 27' 24" E., a distance of 295.00 feet; thence S 7° 02' 35" E., a distance of 315.28 feet from the NE corner of Sec. 1, T20N, R8E, N.M.P.M., said point being on the Easterly right-of-way line of El Llano Road; thence bearing N 80° 32' 36" E., a distance of 144.96 feet to a point; thence along a curve to the left having a radius of 50.00 feet an arc length of 104.72 feet ( ch=N. 80° 32' 36" E., 86.60) to a point, thence bearing N 80° 32' 36" E., a distance of 426.70 feet to a point; thence along a curve to the right having a radius of 25.00 feet an arc length of 39.27 feet (ch= S 54° 27' 24" E., 35.36) to a point; thence bearing S 9° 27' 24" E., a distance of 73.00 feet to a point; thence along a curve to the left having a radius of 113.795 feet an arc length of 12.02 feet (ch= S 12° 29' 00" E., 12.02) to a point; thence bearing S 80° 32' 36" W., a distance of 150.63 feet to a point; thence bearing S 68° 43' 40" W., a distance of 290.57 feet to a point; thence bearing S 87° 41' 56" W., a distance of 259.21 feet to a point; said point being on the Easterly right-of-way line of El Llano Road; thence bearing N 7° 02' 35" W., a distance of 116.78 feet along said right-of-way line to the point of beginning, containing 90,603.51 0 square feet more or less.

Also known as: All of Lots 37 through 43 inclusive and a portion of Lot 44, of La Vista Del Rio Subdivision, Phase 1, as shown on Subdivision Plat filed in Book 102, page 23, records of Santa Fe County New Mexico.

## AND

Beginning at a point which bears S 68° 21' 34" W., a distance of 1163.15 feet, thence S 9° 27' 24" E., a distance of 295.00 feet; thence S 7° 02' 35" E., a distance of 265.24 feet; thence N 80° 32' 36" E., a distance of 551.17 feet from the NW corner of Sec. 1, T20N, R8E, N.M.P.M., thence bearing N 9° 27' 24" W., a distance of 120.00 feet to a point; thence bearing N 80° 32' 36" E., a distance of 300.00 feet to a point; thence bearing S 85° 21' 01" E., a distance of 87.62 feet to a point; thence bearing S 77° 42' 24" E., a distance of 45.50 feet to a point; thence bearing S 37° 53' 55" W., a distance of 231.44 feet to a point; thence bearing S 80° 32' 36" W., a distance of 58.70 feet to a point; thence along a curve to the left having a radius of 50.00 feet an arc length of 104.72 feet ( ch= N 39° 27' 24" W., 86.60) to a point; thence bearing S 80° 32' 36" W., a distance of 155.00 feet to the point of beginning, containing 53,016.317 square feet, more or less.

Also known as: All of Lots 33 through 36 inclusive, of La Vista Del Rio Subdivision, Phase 1, as shown on Subdivision Plat filed in Book 102, page 23, records of Santa Fe County, New Mexico.

3



**United States Department of Agriculture**

Rural Development

September 26, 2023

Multifamily Housing
Field Operations Division
West – Troubled Assets

Rural Housing Service
Attn: Western Regional
Servicing Team
P.O. Box 771340
St. Louis, MO 63177

Guadalupe Chavez
P O Box 4598
Faiview  NM 87533

Dear Guadalupe :

I am providing you this notice concerning the USDA Rural Development financed apartment project, La Vista del Rio, where you are a tenant.

Your apartment was developed with a loan from USDA Rural Development, an Agency of the U.S. Government. Rural Development (RD) accelerated the loan and has liquidated the debt owed to the government. Payment of the debt has been received by RD and is being processed.

This is **not** a notice that your lease is being terminated or not being renewed. The owner is required to comply with all applicable statutes, agency regulations, and your lease contract to continue your tenancy.  The owner cannot evict a protected tenant or refuse to renew a protected tenant's lease without good cause.  The owner may only refuse to renew your lease for "good cause" such as failure to pay rent, damage to property, etc.

The Agency has filed a "Restrictive Use Covenant – The Last Existing Tenant" protecting the tenants who are living at the property on the day the USDA loan was paid in full.  The protected tenants' rents will continue to be calculated as if the property were still in the Rural Development program, for as long as the tenant continues to live at the property.  The owner also has agreed to keep the apartment as a suitable place to live. Any tenant, as well as Rural Development, may enforce the restrictive use covenant.

To help protect you from the impact of your landlord's mortgage payoff, you may also be eligible for a USDA voucher that will pay the difference between the area market rent of the unit you currently live, as determined by Rural Development, and the amount you paid toward rent on the date of the final loan payment.  Voucher availability letters were originally sent to all tenants at La Vista del Rio on March 21, 2023.  If you did not receive a letter and you are interested in a voucher, or if you need another copy of your letter, please contact Stefanie Collins in the USDA voucher unit and let her know that you live at La Vista del Rio in Espanola, NM. She can be reached by phone at 1-844-857-5386 or email: Stefanie.collins@usda.gov.  See the attached documentation for more information on how the voucher works.  You have ten (10) months from the date of the final loan payment to request a voucher.

You may also apply for a letter called a Letter of Priority Entitlement (LOPE).  You may use the letter to go to the top of all waiting lists of any project on which Rural

USDA is an equal opportunity provider, employer, and lender.

Exhibit 18

Development has a mortgage, anywhere in the country, if you are eligible to live there.  You will have up to one year from the date of this letter to apply for your LOPE.  You can use it to be placed on waiting lists for 60 days after you receive the letter.  This letter may also help you get preference in a Department of Housing and Urban Development (HUD) apartment.  This letter will be issued in accordance with all Civil Rights requirements.  To request a LOPE, or for any questions, you may contact me, Robert Hawkes at (208) 944-3753 or at robert.hawkes@usda.gov.


Robert Hawkes
Troubled Assets Team Lead
West Region, Field Operations Division
United States Department of Agriculture

EXHIBIT

I

# PRESS RELEASE

### ManzanaVilla Announces the acquisition of the La Vista Del Rio Apartment Complex in Española, NM
### Española, New Mexico — September 16, 2023

ManzanaVilla Española Valley LLC, proudly announces the acquisition of the La Vista Del Rio Apartments from John Bosley. The apartment complex for decades has provided affordable housing to local residents. Unfortunately, in recent years, the property has also attracted many unscrupulous tenants operating criminal enterprises on the property resulting in unsafe living conditions for remaining law-abiding residents. ManzanaVilla Española Valley LLC intends to rehabilitate and transform the struggling complex into a safe, affordable and environmentally friendly community in the heart of Española, New Mexico.

"We believe that people deserve not just affordable housing, but also safe living conditions. It is inexcusable to force the less fortunate to live in buildings that are not safe due to crimes being committed by other tenants on the property. We are committed to providing safe, affordable, environmentally friendly housing for our tenants. We will have zero tolerance for illegal activities on the property and will evict tenants that commit or assist in committing any crimes on the property." said company President Roberto James Montoya. "We will continue to provide housing for all existing law-abiding tenants in good standing for as long as they wish to reside in the apartments. To help achieve this commitment to our tenants, the company will be offering a limited number of reduced rate units for members of law enforcement to discourage the criminal element." The apartments will be rebranded Manzana Villa Española Valley effective immediately.

The company looks forward to collaborating with the City of Española, Santa Fe County, the US Department of Agriculture, the State of New Mexico, and Project Moxie to rehabilitate and enhance this property.

Company President, Roberto James Montoya was raised in Santa Cruz, NM, has a long history running eco-friendly construction companies and is currently developing hundreds of affordable vacant lots in Rio Rancho, NM. Company CEO, James Gomez and Treasurer Jennifer Gomez reside adjacent to the apartments and are determined to improve the quality of life for their own neighborhood. James has had an outstanding career in all facets of real estate currently a Branch Manager of a local title company and Jennifer is an auditor with the State of New Mexico. Company Vice President Chad Williams was born and raised in Santa Fe and has a long history as a successful Santa Fe businessman and years of experience in real estate rehabilitation. The company officers all have strong ties to the community and are highly motivated to revitalize this crumbling and neglected neighborhood.

ManzanaVilla is now accepting applications for these safe and affordable eco-friendly apartments, and interested at ManzanaVillaEspanola@gmail.com, our website espanola.ManzanaVilla.com or call 505-588-0000. For media inquiries, please contact: Roberto James Montoya at the same number.

Exhibit 19

<u>RESIDENTIAL LEASE AGREEMENT</u>

THIS RESIDENTIAL LEASE AGREEMENT (hereinafter "Agreement"), is made and entered into as of the _____ day of _____, 20_____ by and between James Gomez (hereinafter designated as "Owner", which term shall include Owner's successors and assigns in interest) and _____ (hereinafter "Resident", which  term shall include all Residents, jointly and severally, and shall include Resident's heirs, executors, administrators, assigns, and successors in interest).

## 1. PREMISES

Upon the terms and conditions herein contained, Owner does hereby rent to Resident, and Resident does hereby rent from Owner, the premises located at _____ (the "Premises").

## 2. TERM

The term ("Term") of this lease shall be _____ month(s) commencing at 12:01 a.m. on _____, 20_____ and terminating at midnight on _____, 20_____. In the event Resident remains in possession of the Premises after the expiration of the term, such possession may, at the sole option of Owner, be continued as a month-to-month tenancy, upon the same terms and conditions as set forth in this Agreement.

## 3. RENT

Resident agrees and covenants with Owner to pay as rent for the Premises, without notice or demand, the sum of $_____ (_____ and no/100's DOLLARS) per month, commencing on the 1st day of _____ 20_____ and continuing on the 1st day of each month thereafter during each month of the term of this Agreement. All monies paid by Resident to Owner shall be applied first to outstanding charges, and then to rent. All monies paid by Resident to Owner shall be paid by mailing to:

1910 Avendia Canada
Espanola, New Mexico 87532

## 4. SECURITY DEPOSIT;[LAST MONTH'S RENT]

Resident shall deliver to Owner a security deposit in the amount of $_____ (_____ and no/100's DOLLARS) on or before the first day of the term of this lease, and such sum shall be held by Owner and used to recover any losses incurred from Resident's non-compliance with this Agreement including, but not limited to, damages, repairs, cleaning, unpaid utilities or unpaid rent. Within thirty (30) days after the end of the Term or Resident's departure, whichever is later, Owner will provide to Resident a written itemized statement showing any deduction from the deposit and Owner shall return the balance of the deposit,

**Residential Lease Agreement**                    **1**                    _____  _____
                                                                          **Resident(s) Initials**

if any, to Resident at the last known address.

[Owner has also received last month's rent from Resident in the amount of $_____, which shall be credited against the last month's rent under this Lease and is not an additional Security Deposit].

## 5. LATE FEES AND OTHER CHRGES

Resident shall pay Owner a late fee of five percent (5%) of the rental amount if the rent is not received by the fifth (5th) day of the month.  A service charge of $_____ plus late fees will be charged to Resident for checks returned by the bank because of insufficient funds or stop payments. Any amount owed by Resident to Owner which is not paid when due shall bear interest at the rate of 8.75 percent per annum from the due date of such amount.

## 6. KEYS

By signing this Agreement, Resident acknowledges receipt of _____ door keys and ____ mail box keys to the Premises from Owner. Upon vacating the Premises at the end of this Agreement, Resident shall return all keys to Owner.  In the event all keys are not returned by Resident to Owner upon termination of this Agreement, a charge of $_____ will be due from Resident for replacement of each lock.

## 7. PARKING

Resident is permitted to park no more than _____ vehicle(s) at the Premises and only during the term of this Agreement. Owner may specify, from time to time, where Resident's vehicle(s) may be parked. Only vehicles which are registered and operable may be parked at the Premises. Unless otherwise agreed to by the parties, no recreational vehicles, boats, or trailers may be parked at the Premises. It will constitute a breach of this Agreement for Resident or any of Resident's guests or invitees to park in any place other than approved parking spaces, or park so as to block access or interfere with any other person's right to enter, leave, or park at the Premises. Parking of commercial vehicles at the Premises is prohibited unless approved by Owner in advance in writing. If Owner elects to tow vehicles parked in violation of this Agreement, Resident will pay all costs. Owner may elect to tow with or without notice to Resident.

## 8. PETS

Unless otherwise provided below in this paragraph, no pets of any kind, whether mammals, reptiles, amphibians, birds, fish, rodents, insects, or any other form of animal life whatsoever are allowed, unless the animal is an assistive animal of a disabled person. Owner may require satisfactory proof of need for an assistive animal.

[The following section shall be signed by Owner only if a pet is permitted.]

**Residential Lease Agreement**                    **2**              _____  _____
                                                                    **Resident(s) Initials**

Owner permits the following pet(s) _____ upon prior payment of a one-time pet deposit of $_____.

Signed: _____

## 9.  ACCESS

Owner shall have the right, at reasonable times, and with 24 hours prior written notice, to enter and inspect said Premises, make necessary or agreed repairs, decorations, alterations or improvements, or supply necessary or agreed services, or to show said Premises to workmen or contractors, and shall also have the right to conduct a general inspection of the Premises quarterly.  Furthermore, during the last thirty (30) days of this Agreement's Term, or any renewal term, Owner shall have the privilege of displaying the usual "For Sale" or "For Rent" or "Vacancy" signs on the Premises and shall have the right, at reasonable times, and with 24 hours prior written notice, to enter said Premises for the purpose of showing the same to prospective purchasers, mortgagees, or prospective residents.

## 10.  NOTICE

Any notice required or authorized in this Agreement shall be given in writing via email and/or Certified U.S. Mail.  The name and email address of Owner for the purpose of receiving notices and demands is:

1910 Avenida Canada
Espanola, New Mexico 87532
Tel: 505-927-8844
Email: james@nmltco.com

The name and address of Resident for the purpose of receiving notices and demands is:

Name(s): _____
Mailing Address: _____
Santa Fe, New Mexico 875_____
Tel: _____
Email: _____

## 11. OBLIGATIONS OF RESIDENT

Resident hereby agrees and covenants with Owner to comply with the following terms and conditions:

a.      Resident shall occupy the Premises as a residence for _____ person(s) named: _____, for any allowed pet(s), and for occasional, temporary guests for a duration of not more than five days. The Premises may be

**Residential Lease Agreement**                    **3**                    _____ _____
                                                                         **Resident(s) Initials**

used for no other purpose without the express written consent of Owner, which consent may be granted or withheld in Owner's sole discretion.

b.      Resident shall quit and surrender the Premises peaceably and quietly, upon termination of this Agreement.

c.      Resident shall take good care of any furnishings provided for Resident's use at the Premises. Resident further agrees to deliver up to Owner the Premises and furnishings in good condition at the termination or expiration of any term under this Agreement, normal wear and tear excepted.

d.      Resident shall remove any and all accumulations of rubbish in, on, or about the Premises, and to thoroughly clean the Premises prior to the end of the lease Term.  Resident shall not generate any noise or sounds that are audible from outside of the Premises and/or unreasonable disturb other residents.

e.      Resident shall pay for damages to Premises beyond reasonable wear and to pay for any cleaning and disposal of rubbish deemed necessary by Owner.

f.      Resident shall make only such minor repairs as are necessary to enable Resident to comply with the terms and obligations of this Agreement.  Specifically, Resident agrees not to make any major repairs, improvements or alterations to the Premises unless consented to in writing by Owner, which consent may be granted or withheld in Owner's sole discretion. All alterations, additions, and improvements shall immediately merge with and become a part of the realty and remain in the Premises upon the end of the lease period.

g.      Resident shall be liable Owner and to pay for repairs to the plumbing, range, heating apparatus and electric fixtures whenever damage to such items shall have resulted from Resident's misuse, waste, or neglect.  Resident will inform Owner of any accidents, malfunctions, broken equipment, leaks, or any other similar conditions on the Premises. Resident will also inform Owner, without delay, of any unsafe conditions of which Resident becomes aware of.

h.      Resident shall comply with all applicable municipal, state and federal ordinances, laws, rules and regulations in using the Premises, and not to use or suffer to be used the Premises in any way so as to create any nuisance, and not to make or suffer to be made any waste thereof.

i.      Resident shall not rent or sublet, in whole or in part, any portion of the Premises without written consent of the Owner, nor house or board any person or persons other than the Resident.

j.      Resident agrees that Owner shall not be liable for any damage to persons or property

**Residential Lease Agreement**              **4**              _____  _____

                                                              **Resident(s) Initials**

arising from any cause whatsoever in or about the Premises, and Resident agrees to indemnify and save harmless owner from any and all such claims and liability for damage to persons or property, except for matters arising out of or related to the acts or omissions of Owner.  Resident expressly recognizes and agrees that any insurance for property damage or loss which Owner may maintain on the Premises does not cover the property of Resident, and that Resident should purchase his or her own insurance if s/he desires such coverage.

k.      Resident shall promptly pay any utility charges that are not included in the rent and that are incurred in connection with Resident's use of the premises, either to the utility provider directly if billed by such utility provider, or to Owner upon demand, and to save harmless Owner therefrom.  Utilities shall be paid by the party indicated on the following chart, with those utilities paid by Owner (if any) being included in, and being a part of, the monthly rent payments made by Resident to Owner pursuant to this Agreement.

|                    | OWNER       | RESIDENT    |
|--------------------|-------------|-------------|
| Electricity        | _____  | _____  |
| Gas                | _____  | _____  |
| Propane            | _____  | _____  |
| Refuse             | _____  | _____  |
| Sewer/Septic       | _____  | _____  |
| Water              | _____  | _____  |
| Telephone          | _____  | _____  |
| Cable/Satellite TV | _____  | _____  |
| Internet           | _____  | _____  |

## 12.  OBLIGATIONS OF OWNER

Owner shall make any repairs necessary to keep the Premises and any common areas in a safe condition and to maintain the electricity, plumbing, sanitary, ventilation, heating system, and other facilities and appliances in good and safe working order.

## 13.  ADDITIONAL TERMS

IT IS EXPRESSLY UNDERSTOOD AND AGREED BY AND BETWEEN THE PARTIES HERETO AS FOLLOWS:

a.      That Resident has examined the Premises and any furnishings provided, including the grounds and all buildings and improvements, and that they are, as of the date of this Agreement, in good order, good repair, safe, clean, and habitable.

b.      That smoking of tobacco, cannabis or other products of any kind is not permitted anywhere inside the Premises and is permitted only in designated outdoor smoking areas.

c.      That should the Resident fail to comply with any of his obligations as provided by

**Residential Lease Agreement**                    **5**                    _____  _____
                                                                      **Resident(s) Initials**

law, or in this Agreement or any separate written agreement, the Owner may deliver a written notice to the Resident specifying the act and omissions constituting the breach, and that the Agreement will terminate upon a date not less than seven (7) days after receipt of the notice if the breach is not remedied in seven (7) days, and the rental agreement shall be terminated as provided in the notice unless the Resident adequately remedies the breach prior to the date specified in the notice in which case the rental agreement will not terminate.

d.      That, if rent is unpaid when due and the Resident fails to pay the rent within three (3) days after written notice from the Owner of non-payment and his intention to terminate the Agreement, the Owner may terminate the Agreement and the Resident shall immediately deliver possession of the Premises to the Owner.

e.      That all remedies of Owner hereunder are cumulative and are not exclusive of any other remedy to which Owner may be lawfully entitled.  Owner's failure to require strict performance of any agreement, covenant, or condition of this Agreement, or Owner's receipt of rent with knowledge of the breach of any agreement, covenant, or condition hereof shall not be deemed a waiver of such breach and shall not prevent Owner from thereafter terminating this Agreement, or otherwise demanding strict performance of its terms either for such breach or for breach or for prior or subsequent breaches hereof.

f.      That this Agreement is subject to the provisions of the New Mexico Uniform Owner-Resident Relations Act.  To the extent that any provision of this Agreement conflicts with the provisions of the Act, the Act shall govern.  Committing, or allowing another person to commit, a "substantial violation" of the law as defined by Section 47-8-3(T) of the Act in or around the Premises shall be grounds for immediate termination of the Lease as provided in the Act.

g.      That this writing, including all exhibits hereto, embodies all of the terms and conditions of the Agreement, unless modified or altered by a separate or additional written agreement executed by the parties.

h.      If legal action is required to enforce any provision of this Agreement, the parties consent to the personal jurisdiction of the New Mexico District Court sitting in and for Rio Arriba County, New Mexico, and the prevailing party shall be entitled to recovery of reasonable attorney's fees and costs.

i.      The Property was constructed after 1978, and it therefore, not subject to Federal Lead-Based Paint Regulations.

**Residential Lease Agreement**          **6**          _____ _____
                                                        **Resident(s) Initials**

IN WITNESS WHEREOF, the parties hereto have executed these presents the day and the year first above written.

Owner:                                    Resident(s):


_____        _____

James Gomez

**Residential Lease Agreement**            **7**              _____  _____
                                                          **Resident(s) Initials**